**PUBLISHED**

**UNITED STATES COURT OF APPEALS**

**FOR THE FOURTH CIRCUIT**

UNITED STATES OF AMERICA,
Plaintiff-Appellee,

v.                                                  No. 96-4061

BILLY HOWARD STANFIELD,
Defendant-Appellant.

Appeal from the United States District Court
for the District of Maryland, at Baltimore.
Benson E. Legg, District Judge; Herbert N. Maletz, Senior Judge,
sitting by designation.
(CR-95-191)

Argued: December 2, 1996

Decided: March 31, 1997

Before HAMILTON, LUTTIG, and WILLIAMS, Circuit Judges.

_____

Affirmed by published opinion. Judge Luttig wrote the opinion, in
which Judges Hamilton and Williams joined.

_____

**COUNSEL**

**ARGUED:** Stanley Howard Needleman, Baltimore, Maryland, for
Appellant. Philip S. Jackson, Assistant United States Attorney,
Balti-
more, Maryland, for Appellee. **ON BRIEF:** Steven J. Potter, Balti-
more, Maryland, for Appellant. Lynne A. Battaglia, United States
Attorney, Baltimore, Maryland, for Appellee.

_____

**OPINION**

LUTTIG, Circuit Judge:

Law enforcement officials literally risk their lives each time they approach occupied vehicles during the course of investigative traffic stops. As the Supreme Court has repeatedly observed,"a significant percentage of murders of police officers occurs when officers are making traffic stops." United States v. Robinson, 414 U.S. 218, 234 n.5 (1973). In recognition of the extraordinary dangers to which offi- cers are exposed during such encounters, the Court has consistently accorded officers wide latitude to protect their safety, authorizing them, inter alia, to routinely order both drivers and passengers to exit their vehicles during such stops and to conduct the equivalent of "frisks" of automobile interiors whenever they reasonably believe their safety might be in jeopardy.

The advent of tinted automobile windows, however, has threatened to bring to naught these essential law enforcement protections. Con- fronted with the grave risk that tinted windows pose to the safety of law enforcement personnel, we address herein whether the govern- ment's substantial interest in officer safety during a lawful traffic stop outweighs the intrusion on the privacy interests of the vehicle's occu- pants which results when, because of heavily tinted windows that pre- vent the interior compartment from being viewed, an officer opens a door of the vehicle in order to ensure that the vehicle's driver is unarmed and that there are no other occupants who might threaten his safety during the investigatory stop. We conclude that, perhaps gener- ally, but at least under the circumstances of this case, the substantial government interest in officer safety which exists when law enforce- ment officers must approach vehicles with heavily tinted windows far outweighs any minimal privacy interest the suspect retains in the oth- erwise visible interior compartment of his vehicle.

I.

At approximately 9:00 a.m. on the morning of April 29, 1996, three

officers from the Baltimore City Police Department-- Officers Mackel, Buie and Hamel -- were patrolling a high crime area in West Baltimore known for its open narcotics trafficking when they saw a

2

late model, black Nissan Pathfinder with heavily tinted windows ille-
gally parked in the middle of the street, effectively blocking traffic.
See Md. Transportation Code Ann. §§ 21-1003(r), 27-101(a) & (b) (Michie 1996). The officers, who were armed and wearing bullet-proof vests over their uniforms because of the dangerousness of their assignment, see United States v. Stanfield, 906 F. Supp. 300, 301 (D. Md. 1995), circled the block and, when the driver of the Pathfinder made no effort to move his vehicle to allow a free flow of traffic, parked their unmarked vehicle in front of the Pathfinder. Upon exiting their cruiser, the officers noticed that the Pathfinder's driver, appel-lant Billy Howard Stanfield, was talking to a man leaning from a sec-ond story window, whom the officers recognized as William Staten, a known drug dealer. See id.; J.A. at 151-52 (testimony of Officer Mackel); see also J.A. at 19 (Government's Memorandum of Law in Response to Defendant's Motion to Suppress Evidence).

The officers approached Stanfield's Pathfinder from both the driver and passenger sides, and, as they did so, they noticed that the front driver's side window was down, but that the front passenger side win-dow was raised. See Stanfield, 906 F. Supp. at 301, 303. The tinting on the Pathfinder's windows was so dark that Officer Mackel, who was approaching on the passenger's side, could not see into the vehi-cle. See id. at 302, 303. Nor could Officers Buie and Hamel see much of the vehicle's interior during their approach from the driver's side. As a consequence of the officers' inability to see inside the vehicle as they approached, Officer Mackel opened the front passenger side door of Stanfield's vehicle in order to determine whether Stanfield was armed or had access to weapons and whether he was alone in the Pathfinder. When Officer Mackel opened the passenger door, he saw in plain view, from his vantage point entirely outside the vehicle, see id., a clear plastic bag of cocaine protruding from the mouth of a brown paper bag which was overturned on the back seat of the Path-finder. See id. & n.6.**1** The officers arrested Stanfield, searched the

_____

**1** The recited facts are those as found by the district court. A number
of the material facts were vigorously disputed at the suppression

hearing
and, ultimately, the district court did not fully credit the testimony of
either the officers or Stanfield, a fact which brings the case to us in a
somewhat awkward posture. For example, the officers testified that both
the front driver and passenger side windows were open, and that the

3

Pathfinder, and discovered a nine-millimeter semi-automatic hand-gun, numerous empty vials, two contact pagers, and over 200 grams of cocaine. See id. at 302. Stanfield was subsequently charged with possession with intent to distribute cocaine and possession with intent
to distribute cocaine base in violation of 21 U.S.C.§ 841(a)(1).

Prior to trial, Stanfield moved to suppress the cocaine seized from the back seat of his Pathfinder, contending that the search affected by
Officer Mackel's opening of the front passenger door was unconstitu-
tional under the Fourth Amendment and, therefore, that the cocaine discovered as a consequence of that search must be suppressed. Fol-lowing an evidentiary hearing, the district court denied the motion,
upholding the search on two independent grounds. First, citing Texas
v. Brown, 460 U.S. 730, 740 (1983), the district court held that Offi-
cer Mackel's opening of the passenger side door was permissible because Stanfield did not have a legitimate expectation of privacy in
the interior of his car. See Stanfield, 906 F. Supp. at 304 n.9. Second,
the district court held that, under Michigan v. Long, 463 U.S. 1032 (1983), "Officer Mackel was Constitutionally permitted to open the door to determine whether there were other[ ] [occupants in the vehi-
cle] and if any weapons were within Stanfield's immediate reach," determinations which the district court found were otherwise virtually
impossible because of the heavy window tinting. Stanfield, 906 F. Supp. at 304; see also id. at 303-04 & n.11 ("[B]ecause Officer Mackel was unable to see through the heavily tinted windows of the
_____

cocaine was seen through the open passenger window. See Stanfield, 906
F. Supp. at 301. The district court, for reasons we find difficult to under-
stand, rejected this testimony seemingly for the reason alone that it was
fifty-nine degrees on the day in question, and therefore "it seem[ed]
more likely than not that [Stanfield] would have left the passenger's side
window up." See id. at 303 n.5. Stanfield, for his part, testified that the
passenger side window was raised and that Officer Mackel opened the passenger side door, climbed inside the vehicle, and searched under the
back seat to find the cocaine. See id. at 302. The district court

specifi-
cally found, however, that the cocaine was in plain view once Officer
Mackel opened the passenger side door and that Officer Mackel, contrary
to Stanfield's contention, neither entered the vehicle nor searched under
the vehicle's seat. See id. at 303 n.6.

4

Pathfinder, he had an objectively reasonable belief that Stanfield (or
a hidden passenger) was potentially dangerous.").

Following the district court's denial of Stanfield's suppression
motion, Stanfield pled guilty to one count of possession, reserving the
right to appeal the district court's suppression ruling that is now
before us. For the reasons that follow, we affirm.

II.

"[T]he `touchstone of the Fourth Amendment is reasonableness.'"
Ohio v. Robinette, 117 S. Ct. 417, 421 (1996) (quoting Florida v.
Jimeno, 500 U.S. 248, 250 (1991)). And, as the Court explained in
Pennsylvania v. Mimms, 434 U.S. 106 (1977), reasonableness "de-
pends `on a balance between the public interest and the individual's
right to personal security free from arbitrary interference by law offi-
cers.'" Id. at 109 (quoting United States v. Brignoni-Ponce, 422 U.S.
873, 878 (1975)). Under this balancing test, the Supreme Court has
consistently approved of protective searches of persons, vehicles, and
even homes, during routine and other lawful investigatory detentions,
in recognition of the paramount interest in officer safety and the
extraordinary risks to which law enforcement officials are exposed
during such detentions.

Thus, for example, in Terry v. Ohio, 392 U.S. 1 (1968), the Court
sanctioned the now-familiar "pat-down" search, or "frisk," because of
the "immediacy" of the government's interest in officer safety, not-
withstanding its conclusion that "[e]ven a limited search of the outer
clothing for weapons constitutes a severe . . . intrusion upon cherished
personal security," id. at 24-25. If an officer possesses a reasonable
belief based on "specific and articulable facts" that the suspect is
potentially dangerous, id. at 21, reasoned the Court, then the officer
is justified in undertaking the "limited steps" necessary to "protect
himself and others from possible danger." Id . at 28.

Fifteen years later, in Long, the Court authorized what are essen-
tially "frisks" of automobile interiors during traffic stops, see
Maryland v. Buie, 494 U.S. 325, 332 (1990), holding that such pro-

tective searches are "justified by the principles. . . established in
_Terry_." _Long_, 463 U.S. at 1046. Recognizing that all "investigative

5

detentions involving suspects in vehicles are especially fraught with
danger to police officers," id. at 1047, and accepting without discus-
sion that an area search of a vehicle is less intrusive than the frisk of
the person, the Court concluded that "the balancing required by Terry
clearly weighs in favor of allowing the police to conduct an area
search of the passenger compartment to uncover weapons, as long as
they possess [a] reasonable belief that the suspect is potentially dan-
gerous." Id. at 1051.**2**

In Mimms and Maryland v. Wilson, 65 U.S.L.W. 4124 (Feb. 19,
1997), the Court even adopted bright-line rules that officers may, as
a matter of course, order both drivers and passengers from vehicles
during routine traffic stops in order to ensure that such stops are com-
pleted without incident.

The Court in Mimms held that the "inordinate risk" that exists every
time "an officer . . . approaches a person seated in an automobile,"
434 U.S. at 110, justifies a per se rule that drivers may be ordered out
of their vehicles during lawful traffic stops, whether or not there
exists any particular reason under the circumstances to believe that
officer safety might be in jeopardy. In contrast to the substantial state
interest in safety at stake when officers must approach a stopped vehi-
cle, the Court characterized the additional intrusion on personal lib-

---

**2** The Court expressly extended Terry and Long in Buie, authorizing,
"in conjunction with . . . in-home arrest[s]," 494 U.S. at 337, protective
sweeps even of personal residences, where a reasonably prudent officer,
based upon articulable facts, would believe "that the area to be swept
harbors an individual posing a danger to those on the arrest scene." Id.
at 334 (stating that the adopted standard "is no more and no less than was
required in Terry and Long, and as in those cases, we think this balance
is the proper one."). Although the Court remanded for application of this

standard, it concluded that, even though the suspect sought by police had been arrested and handcuffed, and all discernible threat to the police had been neutralized, a "cursory search" of Buie's house still might be permissible on the ground that the house could "harbor[ ] other persons who are dangerous and who could unexpectedly launch an attack" on the officers. Buie, 494 U.S. at 333. Not surprisingly, the Maryland Court of Appeals on remand did in fact hold that the cursory search of Buie's basement was reasonable. See Buie v. Maryland, 580 A.2d 167, 172 (Md. 1990).

erty occasioned by requiring drivers to exit their vehicles and to move
off onto the shoulder of the road as "de minimis," "at most a mere
inconvenience," id. at 111, and "hardly ris[ing] to the level of a `petty
indignity,'" id. (quoting Terry, 392 U.S. at 17), reasoning that "[t]he
driver is being asked to expose to view very little more . . . than is
already exposed" when the driver is seated in his automobile. Id.

Finally, repeating its oft-repeated observation that the government
has a "legitimate" and "weighty" interest in officer safety, the Court
in Wilson recently expanded the Mimms per se rule to allow officers
to order not only drivers, but all occupants, to exit vehicles and move
off onto the shoulder of the road during routine traffic stops. See 65
U.S.L.W. at 4126. While acknowledging that the passengers' liberty
interests implicated by orders to exit vehicles might be stronger than
those of the drivers, the Court nonetheless readily concluded that
these interests likewise are "minimal" and necessarily must yield to
the state's interest in officer safety, finding persuasive Maryland's
common-sense argument that every occupant in a vehicle "increases
the possible sources of harm to the officer." Id.

A.

1.

Notwithstanding that the Court "generally eschew[s] bright-line
rules in the Fourth Amendment context," id . at 4125 n.1; see also
Robinette, 117 S. Ct. at 421, we believe that the Court's decisions in
Mimms and Wilson in particular would support a holding that when-
ever, during a lawful traffic stop, officers are required to approach a
vehicle with windows so heavily tinted that they are unable to view
the interior of the stopped vehicle, they may, when it appears in their
experienced judgment prudent to do so, open at least one of the vehi-
cle's doors and, without crossing the plane of the vehicle, visually
inspect its interior in order to ascertain whether the driver is armed,
whether he has access to weapons, or whether there are other occu-
pants of the vehicle who might pose a danger to the officers. Indeed,

it seems to us that a contrary holding would not only be irreconcilable
with, but arguably undermine altogether, the caselaw from the Supreme Court that was developed specifically for the purpose of pro-

tecting officer safety during what are, in today's society, frighteningly perilous encounters.

Even where the interiors of vehicles are fully visible, "roadside encounters between police and suspects are especially hazardous," Long, 463 U.S. at 1049, with as many as "30% of police shootings occur[ing] when a police officer approache[s] a suspect seated in an automobile," Mimms, 434 U.S. at 110; see also Adams v. Williams, 407 U.S. 143, 148 n.3 (1972). In fact, as the Court noted recently in Wilson, in 1994 alone, 5,762 assaults on police officers occurred during the course of traffic pursuits or stops. See Wilson, 65 U.S.L.W. at 4125 (citation omitted). Thus, "it [is]`too plain for argument'" that the governmental interest in officer safety during traffic stops is substantial. Id. at 4125 (quoting Mimms, 434 U.S at 110).

When, during already dangerous traffic stops, officers must approach vehicles whose occupants and interiors are blocked from view by tinted windows, the potential harm to which the officers are exposed increases exponentially, to the point, we believe, of unconscionability. Indeed, we can conceive of almost nothing more dangerous to a law enforcement officer in the context of a traffic stop than approaching an automobile whose passenger compartment is entirely hidden from the officer's view by darkly tinted windows. As the officer exits his cruiser and proceeds toward the tinted-windowed vehicle, he has no way of knowing whether the vehicle's driver is fumbling for his driver's license or reaching for a gun; he does not know whether he is about to encounter a single law-abiding citizen or to be ambushed by a car-full of armed assailants. He literally does not even know whether a weapon has been trained on him from the moment the stop was initiated. As one officer put the obvious: "If the suspect has a weapon, I might not see it until he rolls down the window. He may just shoot me through the window."[3]  If, as the Court has noted,

---

[3] Leef Smith, "They're Dark No More," The Washington Post, Dec. 4, 1996, at VO4 (explaining that suspected gang members often drive around "in cars whose windows are all but blacked out," using the cover

created by the tinting to "hide illegal activities") (statement of Officer
Linda Hudson); see also, e.g., Norman Peckham, "Phoenix Now Enforc-ing Window Tint Law," The Tucson Citizen, March 17, 1995, at 9E ("Heavy tint may conceal the fact that the occupant may have a

8

officers face an "inordinate risk" every time they approach even a vehicle whose interior and passengers are fully visible to the officers, Mimms, 434 U.S. at 110, the risk these officers face when they approach a vehicle with heavily tinted windows is, quite simply, intolerable. In fact, it is out of recognition of just such danger that at least twenty-eight states, including Maryland, have now enacted laws either regulating or altogether prohibiting the use of tinted windows on vehicles in their states.**4**

_____

weapon.") (statement of Officer Eugene Mejia); Caroline Lemke, "In the Dark: Tinted Windows Give Cars A Cool Look, But Some Are Illegal," The Los Angeles Times, February 13, 1992, at 2 (When a car has tinted windows "[i]t is hard for an officer to see into [that] car. A gun could be pointed at you. It puts you in a vulnerable position.") (statement of Officer John Marinez).

**4 See** Alabama Code § 32-5-215(e) (Michie 1996); Arkansas Code of 1987 Ann. § 27-37-306 (1987-95); Connecticut Gen. Stat. Ann. § 14-99g(b) (West 1996); Delaware Code. Ann. § 21-4313 (1975-95); Code of Georgia § 40-8-73.1 (1982-96); Idaho Code§ 49-944(1) (Michie 1948-96); West's Smith-Hurd Illinois Comp. Stat. Ann.§ 5/12-503 (West 1996); West's Ann. Indiana Code § 9-19-19-4(c) (West 1996); Baldwin's Kentucky Rev. Stat. Ann. § 189.110(3) (Banks-Baldwin 1996); West's Louisiana Stat. Ann. § 361.1 (West 1996); Maine Revised Stat. Ann. § 29-1916(3) (1996); Ann. Code of Maryland§ 22-406 (Michie 1957-96); Michigan Comp. Laws Ann. § 257.709 (1996); Mississippi Code 1972 Ann. § 63-7-59 (1995); Montana Code Ann.§ 61-9-405 (1978-95); Nebraska Rev. Stat. of 1943 § 60-6,257 (1995); Nevada Rev. Stat. § 484.6195 (1995); New Hampshire Stat. Ann.§ 265-95 (1995); Gen Stat. of North Carolina § 20-127(b) (Michie 1944-96); North Dakota Century Code § 39-21-39 (Michie 1995); Baldwin's Ohio Rev. Code Ann. § 4513.241 (Baldwin-Banks 1996); 1995 Oregon Rev. Stat. § 815.221 (1995); Code of Laws of South Carolina 1976 Ann. § 56-5-5015 (1995); Tennessee Code Ann. § 55-9-107 (1955-96); Utah Code, 1953 § 41-6-149 (Michie 1987-96); Code of Virginia § 46.2-1052(C)(1) (Michie 1982-96); Wyoming Stat. 1977 § 31-5-962(b) (1977-96); West's Revised Code of Washington Ann. § 46.37.430(5) (1996). The District of Columbia and Puerto Rico have done so as well. See District of Columbia Code 1981 § 40-718.1 (1981-96); Laws of Puerto Rico Ann. § 9-1134 (1994).

In contrast to the indisputably substantial government interest in
protecting its law enforcement officials from the danger that inheres
in the lawful stop of a vehicle with heavily tinted windows, the pri-
vacy and liberty interests implicated by the opening of such a vehi-
cle's door for the limited purpose of determining whether the vehicle
is occupied by one or several persons and whether the vehicle's occu-
pants are armed or have access to weapons, are, although not unim-
portant, comparatively minor, and will always be so.

It is axiomatic, of course, that "[o]ne has a lesser expectation of pri-
vacy in a motor vehicle," in part because "its function is transporta-
tion and it seldom serves as one's residence or as the repository of
personal effects." United States v. Chadwick, 433 U.S. 1, 12 (1977)
(quoting Cardwell v. Lewis, 417 U.S. 583, 590 (1974) (plurality opin-
ion)). Because of this, and the fact that vehicular travel is, of neces-
sity, highly regulated, individuals traveling in vehicles "must expect
that the State, in enforcing its regulations, will intrude to some extent"
on their privacy. New York v. Class, 475 U.S. 106, 113 (1986).

But, apart from the fact that there is a considerably reduced privacy
interest in a vehicle's interior passenger compartment as a matter of
law, the driver and other occupants of a lawfully stopped vehicle have
already had their liberty curtailed. Moreover, because the driver must
comply with routine requests for identification and registration, he
will be required at some point during the brief detention to expose the
interior compartment of his vehicle to view through at least one win-
dow, if for no other reason than to interact with the officer. Of course,
when the driver lowers the window, then much if not all of the car's
interior will be visible to the officer. The additional interference with
the occupants' privacy interests affected by the opening of one of the

vehicle's doors would seem minimal when measured against the enormous danger law enforcement officers face when they approach a vehicle with heavily tinted windows. Such an intrusion would seem considerably less than the intrusions affected by ordering the driver
and passengers to exit the vehicle and to proceed to the shoulder of
the road, which were held in <u>Mimms</u> and <u>Wilson</u>, respectively, to be "<u>de minimis</u>" in comparison to the states' interests in protecting their
law enforcement personnel under circumstances far less inherently dangerous than those existing when the stopped vehicle has heavily tinted windows. Not only does the person subjected to the limited

10

search entailed in the opening of the vehicle door not have his entire
body exposed to the view of the officers and public, he also retains
his liberty interest in remaining seated in his automobile during the
duration of the detention. Indeed, the actual invasion of privacy
entailed in an officer's opening of the vehicle door is indistinguish-
able from, if not precisely the same as, that which occurs when an
occupant is required to open a door to exit a vehicle pursuant to an
order given under the authority of <u>Mimms</u> or <u>Wilson</u>.

2.

Even if there were reasonable alternatives to allowing officers to
open the door of a vehicle with heavily tinted windows in order to
ascertain whether the driver is armed and whether there are other
occupants in the vehicle, we would hesitate to impose them on the
law enforcement community as a matter of constitutional law. As the
Supreme Court has been at pains to observe, during <u>Terry</u>-type stops,
officers "must make . . . `quick decision[s] as to how to protect [them-
selves] and others from possible danger'" at times when they are "par-
ticularly vulnerable," and thus it has "not required that officers adopt
alternate means to ensure their safety in order to avoid the intrusion
involved in [such an] encounter." <u>Long</u>, 463 U.S. at 1052 (quoting
<u>Terry</u>, 392 U.S. at 28); <u>see also id</u>. at 1052 n.16. That is, the Court
has scrupulously avoided substituting its judgment for that of law
enforcement as to how best to ensure officer safety.

With that said, however, we are at a loss to identify an acceptable
alternative to a rule such as that we suggest would be justified. Upon
a moment's reflection, it becomes apparent that neither requiring offi-
cers (while in their cruisers or as they proceed toward the stopped
vehicle) instead to order occupants to exit the vehicle nor requiring
that they order that all of the vehicle's doors be opened, represents an
acceptable, or even a reasonable, alternative. To require officers to
order the vehicle's occupants to exit as the officers approach the
stopped vehicle exposes the officers to the very danger to which we
believe it is unconscionable to subject them, namely, that they might

be fired upon as they approach the vehicle. As the Court observed in
Terry, it is by definition "unreasonable to require that police officers
take unnecessary risks in the performance of their duties." 392 U.S.
at 23. On the other hand, to insist that officers remain in their vehicles

11

and order the occupants out ignores the fact that, with heavily tinted
windows, the officers could never know whether all of the vehicle's
occupants had exited; and, eventually, the officers would still be
required under this alternative to approach a vehicle which, insofar as
the officers could know, still held passengers who might be armed
and dangerous. Ordering that the vehicle's doors be opened, of
course, allows the vehicle's occupants legitimately to move about the
vehicle in ways that would enable them to access available weapons,
which represents a separate danger unto itself.

Therefore, in the end, we believe, it will be impractical, if not
impossible, for law enforcement officers to neutralize the dangers to
which they are exposed by virtue of heavily tinted windows. There
simply do not appear to be any alternatives to the bright-line rule we
suggest, which would infringe less on the residual privacy interests
that drivers and passengers retain in the interior compartment of a
lawfully stopped vehicle, yet still allow law enforcement officers to
take that control of the situation that enables them to minimize the
risk of harm to themselves and to the vehicle's occupants. Cf. Wilson,
65 U.S.L.W. at 4126 ("The risk of harm to both the police and the
occupants is minimized if the officers routinely exercise unquestioned
command of the situation." (quoting Michigan v. Summers, 452 U.S.
692, 703 (1981)). A bright-line rule that officers could always pursue
the course of opening the door of a tinted-windowed vehicle when,
in their informed judgment, such an act appears necessary to protect
their safety, would not render the stops of such vehicles risk-free, but
it would at least reduce to an extent the enormous danger to which
law enforcement authorities are exposed as a consequence of the
advent of tinted windows.

B.

Even absent a Mimms/Wilson-type per se rule that officers may, in
the circumstances we have described, open a vehicle's door to deter-
mine the number of occupants within and whether any of those occu-
pants are armed or have access to weapons, however, Officer
Mackel's opening of Stanfield's passenger door was fully authorized
under the principles, if not by the direct holdings, of Terry, Long

and
Buie. Officer Mackel's belief that he was potentially in danger as he
approached Stanfield's Pathfinder was imminently reasonable; it

would be folly to suggest otherwise. Under Terry , Long and Buie, therefore, it is clear that Officer Mackel could have conducted a protective search of the entire interior compartment of Stanfield's vehicle to ensure his safety and that of his partners. It follows a fortiori that Officer Mackel's much more limited search of merely opening the Pathfinder's door was reasonable under the Fourth Amendment.

As our previous discussion suggests, we are convinced that the presence of windows so tinted that the vehicle's interior compartment is not visible is, in itself, a circumstance that would cause an officer reasonably to believe that his safety might be in danger -- as the district court held. When the fact of the tinted windows on Stanfield's Pathfinder is considered together with the other circumstances informing Officer Mackel's judgment as he approached Stanfield's vehicle on the morning of April 29, 1996, we are satisfied that no reasonable officer would have failed to appreciate the potential danger confronting Officer Mackel and his partners.

First, Stanfield was, at the time of the stop, in violation of the state's traffic laws, having parked his Pathfinder in the middle of a two-way street, which was not passable by two cars simultaneously. See Stanfield, 906 F. Supp. at 301. Second, Stanfield's vehicle was stopped in the early morning in a relatively deserted area of town. See id.; J.A. at 128. Third, Stanfield's vehicle was stopped in an area of Baltimore known for its open narcotics trafficking and high crime rate. See Stanfield, 906 F. Supp. at 301; J.A. at 53. As we have often noted, where there are drugs, there are almost always guns. And, as the Supreme Court has recognized, in a high crime area, "the possibility that any given individual is armed is significant." Buie, 494 U.S. at 334 n.2. Fourth, Stanfield was driving a vehicle which, according to the officers' testimony and the district court's factual finding, "is of the class of four wheel drive vehicles favored by drug dealers," and is also "the preferred target of car thieves." Stanfield, 906 F. Supp. at 301 & n.3; J.A. at 163-64. Fifth, as the district court found, the

offi-
cers did not know and could not determine, because of the tinting on
the windows, "whether Stanfield was alone or whether any weapon
was within arms reach of the defendant." See Stanfield, 906 F. Supp.
at 303. And, sixth, as the district court found, Stanfield had been seen
by the officers conversing with William Staten, a known drug dealer,
immediately prior to his encounter with Officers Mackel, Buie and

13

Hamel. Id. at 301, 304 n.10; J.A. at 151-52, 237 (testimony of Officer
Mackel); J.A. at 19 (Government's Memorandum of Law in Response
to Defendant's Motion to Suppress Evidence).[5] Only the most fool-
(Text continued on page 16)

---

(Text continued on page 16)

[5] Although the government opposed Stanfield's suppression motion,
see Government's Memorandum of Law in Response to Defendant's
Motion to Suppress Evidence, J.A. at 18-40, on appeal it
inexplicably
conceded error and then went to quite unusual lengths to have the
case
decided on the briefs and without oral argument. Unwilling to
reverse the
district court's judgment summarily, we ordered the reluctant
Assistant
United States Attorney, Philip S. Jackson, to appear and argue the
case.
When confronted by the court with the Supreme Court authorities
described above, and questioned why he was unable even to advance
good-faith arguments before this court in support of the district
court's
judgment, Mr. Jackson represented to the court that he had
confessed
error solely because, in his view, there was no basis for the
district
court's finding that Staten was a known drug dealer, a view that
was
nowhere mentioned in the government's three and one-half page
brief.
Mr. Jackson thereafter, however, conceded that neither he nor the
United
States had any basis at all for challenging the district court's
finding as
clearly erroneous, ultimately acknowledging that if that finding
were sus-
tained, the United States had improperly confessed constitutional
error.

We find the district court's finding to be amply supported by the
record, especially the testimony of Officer Mackel, in response to
ques-
tions from Stanfield's counsel:

    Q: What really happened here was that you were on routine
    patrol, in your bullet proof vests, and you saw Mr. Stanfield
    talk-
    ing to someone who you knew, isn't that correct?

    A: Once I pulled into the block, that is correct. I recognized
    who it was.

    . . .

Q: . . . Now, when you saw Mr. Stanfield talking to someone, isn't it true that that is why you really stopped your vehicle and got out of the car and started investigating Mr. Stanfield?

A: No.

Q: Isn't it true that that person [Staten] you had known through previous, I guess through some previous dealings, that he might be or was a law breaker?

A: Yes, I had dealings with Mr. Staten before.

14

Q: And the real reason you got out of the car, all three of you,
had nothing to do with being double parked, but you wanted to
see what was up, isn't that correct?

A: No, that is not true.

Q: And you really, all you really had was a hunch and you just
wanted to go in and see what was up?

J.A. at 152.

It is plain from this exchange between defendant's own counsel and
Officer Mackel that defense counsel himself understood that Officer
Mackel had previously had "dealings" with Staten in connection with
drug transactions. Stanfield even contended to the district court
that, as
the officers exited their cruiser, "one of the officers then
shouted up to
William [Staten] and asked [Staten] whether he had stopped dealing
drugs." See J.A. at 238.

It is plain that defense counsel's strategy was to develop a case
that the
officers had relied upon the pretext of Stanfield's traffic offense
to inves-
tigate their "hunch" that, because Stanfield was talking to a known
drug
dealer, he might be engaged in a drug transaction, and, in fact,
this was
the very argument defendant advanced before the district court, see
J.A.
at 238 (opinion of district court) ("Stanfield argues that the
officers were
not attracted to him because of any traffic violation but because
they
were investigating drug trafficking."). Indeed, although Stanfield
(for
obvious reasons) does not mention the officers' previous dealings
with
Staten in his submissions to this court, one of Stanfield's two
assign-
ments of error from the district court's denial of his suppression
motion
was that the officers acted only on this hunch. See Appellant's Br.
at 2-
9.

It is evident, therefore, that the district court's finding that
Stanfield
was talking with a man known by the officers to be a drug dealer is
unas-
sailable. The Assistant United States Attorney himself, albeit in

direct
contradiction of his own representations before us, even represented to
the district court that "[a]n officer recognized th[e] individual [to whom
Stanfield was talking] as William Staten, an individual about whom [the
officer] had received information indicating Staten's involvement in the
distribution of controlled substances." See  Government's Memorandum
of Law in Response to Defendant's Motion to Suppress Evidence, J.A.
at 18, 19.

15

hardy would not have believed that his safety was "potentially" in danger, see Long, 463 U.S. at 1051, as he approached Stanfield's Pathfinder.

There was more reason for Officer Mackel to believe that his safety might be in danger than there was in Long for Deputies Howell and Lewis to believe that their safety might be in danger. The Supreme Court there held that Howell and Lewis were "clearly justified" in their conclusion that Long might pose a danger to them were he allowed to reenter his vehicle because (1) "[t]he hour was late and the area rural," (2) Long had been speeding and had swerved into a ditch, (3) Long had appeared to be under the influence of an intoxicant, and (4) the officers had seen a hunting knife on the floorboard of Long's car.**6** 463 U.S. at 1050. The Court readily reached this conclusion notwithstanding that the officers had already completed their detention of the suspect without incident; they knew that there were no other occupants in Long's vehicle; they also knew that there was no one else in the vicinity who could pose an immediate threat to their safety;

_____

**6** When listing the circumstances supporting the reasonableness of the officers' belief that they might be in danger if Long were allowed to reenter his vehicle, the Court did, as noted, mention that the officers had earlier seen the hunting knife on the floorboard of Long's automobile. It is relatively clear, however, that the knife was mentioned more in support of the court's alternative holding that the search of Long's person was also reasonable, and that the presence of the knife played little, if any, role in the Court's determination that Officers Howell and Lewis were reasonable in their belief that their safety might be at risk if Long were allowed to reenter his car, see 463 U.S. at 1050 & n.15. When it mentioned the knife, the Court even noted that " Long was not frisked until the officers observed that there was a large knife in the interior of the car into which Long was about to reenter," id. at 1050 (emphasis

added), and, as the Court had noted earlier, after observing the knife on the floorboard, "[t]he officers [had] stopped Long's progress and subjected him to a _Terry_ protective pat-down." _Id_. at 1036. As the Court explained, the question with respect to the search of the vehicle's passenger compartment was whether the officers acted "unreasonably in taking preventive measures to ensure that there were no _other_ weapons [other than the knife] within Long's immediate grasp before permitting him to reenter his automobile." _Id_. at 1051 (emphasis added).

16

they knew that Long did not have a weapon on his person; they had determined that, although Long was not impaired sufficiently that he could not drive, he was unlikely to initiate an assault on the officers; and they had reason to believe that Long wished to leave the scene without further involvement with the authorities.

In contrast, here, Officers Mackel, Buie and Hamel had just initiated their encounter with Stanfield, who was driving a vehicle not uncommonly associated with drug activity; they were in a high crime area known for its open drug trafficking; they had, only moments earlier, seen Stanfield talking with a known drug dealer; they did not know whether Stanfield was alone or accompanied by others; they were unable, because of the tinting of the windows, to determine whether Stanfield, or any other occupants of the vehicle, were presently armed or had ready access to weapons; and they had no reason to think Stanfield might be incapacitated in such a way as actually to reduce any threat he might pose to them.

If there was less reason for Officer Mackel to believe that he might be in danger than there was in Terry for Officer McFadden to believe he might be in danger, we are satisfied that the difference is not significant enough to warrant a different conclusion as to the reasonableness of Officer Mackel's perception of possible danger, especially given the greater vulnerability of the officers here because of the heavy tinting of the Pathfinder's windows. Officer McFadden had observed conduct by Matthew Terry and his companions that was entirely innocent in itself, although suspicious to McFadden, a trained officer, who recognized the conduct as "consistent with [an] hypothesis that the[ ] men were contemplating a daylight robbery." Terry, 392 U.S at 28. Under these circumstances, observed the Court, it was reasonable for Officer McFadden to assume that one or more of the men might be armed. Here, of course, Stanfield was not engaged in entirely innocent behavior; he was actually committing an offense, albeit a relatively minor traffic offense, when he was stopped. And, it bears repeating, he was stopped in an area of the city known for its open drug trafficking, in a vehicle frequently associated with drug activity, and he was talking with a known drug dealer. A trained offi-

cer certainly would be as warranted in believing that his safety might
be in danger in these circumstances as in those present in <u>Terry</u>. Of
course, in neither instance need the officer have been "absolutely cer-

17

tain that the individual [was] armed; the[only question] is whether a
reasonably prudent man in the circumstances would[have been] war-
ranted in the belief that his safety or that of others was in danger."
Terry, 392 U.S. at 27. As to this question, in this case, we have no
doubt whatsoever.

Although the Court in Buie did not itself resolve the ultimate issue
of whether the protective sweep undertaken by the officers was justi-
fied under the Terry and Long standard, which the Court there held
was applicable to the officers' sweep of Buie's home, the Court spe-
cifically analogized law enforcement's interest"in taking steps to
assure themselves that the house in which a suspect is being, or has
just been, arrested is not harboring other persons who are dangerous
and who could unexpectedly launch an attack," to the "immediate
interest of the police officers [in Terry and Long] in taking steps to
assure themselves that the persons with whom they were dealing were
not armed with, or able to gain immediate control of, a weapon that
could unexpectedly and fatally be used against them." Buie, 494 U.S.
at 333. The Court noted that an in-home arrest, unlike the typical
encounter on the street, "puts the officer at the disadvantage of being
on his adversary's `turf[,]' [and that] [a]n ambush in a confined set-
ting of unknown configuration is more to be feared than it is in open,
more familiar surroundings." Id. Even so, however, the Court was
hesitant to characterize either the risk of danger during an in-home
arrest or the risk of danger in an "on-the-street or roadside investiga-
tory encounter" as the greater. Id. Based upon these overarching
observations concerning the relative risks associated with in-home
arrests and traffic stops, and with due regard to the relevant specifics,
we are even unprepared to say that the risk of danger to Officers
Mackel, Buie, and Hamel was less pronounced than was the risk to
the officers in Buie.

First, and most significantly, any difference between the inherent
risk existing during an in-home arrest and a lawful investigatory traf-
fic stop due to the officers' lack of familiarity with the surroundings,

was minimized, if not entirely eliminated, in this case, because the interior of Stanfield's vehicle was not visible to the officers. Through the use of heavy tinting, the driver and occupants of a vehicle effectively secure for themselves, as Stanfield did in this case, a "confined setting of unknown configuration," forcing law enforcement authori-

18

ties to confront them on their own "turf"-- not unlike if they were hiding in their home. Second, some six or seven officers were present at Buie's residence to affect the arrest, whereas only three officers, were investigating Stanfield. Third, the officers in Buie had proceeded to Buie's house for the specific purpose of arresting Buie and were fully prepared for anything that might develop in connection with that assignment; unlike Officers Mackel, Buie, and Hamel, they had not simply come upon Buie unexpectedly in circumstances requiring a quick, on-the-street judgment. Fourth, the officers had already arrested Buie and had only to depart the residence and premises; at the time of their search of Buie's basement, the officers were not merely beginning their investigatory detention, as in the case sub judice, when a confrontation is more likely. Fifth, two days had lapsed since the robbery in Buie, and, although it was certainly not unreasonable to think someone (in particular, Buie's accomplice) might be hiding in the house with Buie, the officers had nothing spe- cific to support such an inference. As the dissenting judge on the Maryland Court of Appeals said in his opinion on the remand from the Supreme Court:

> From the information elicited at the suppression hearing, we do not know whether Allen [Buie's accomplice] had been arrested or was still at large. The testimony at the hearing does not give any indication that Allen was seen entering or leaving Buie's home during the three day surveillance period. In fact, there was no testimony that placed Allen at Buie's home at any time prior to Buie's arrest. Neither is there information as to what type of relationship Buie and Allen had; that is, we do not know whether they were long- time friends who spent a great deal of time together or whether the only time they were ever together was the night of the alleged robbery.
>
> The inconclusive surveillance . . . does not help the State. It surely does not permit the inference that the police thought Allen was at Buie's house, for if they had believed that they would have brought along his arrest warrant as well as Buie's.

Buie v. Maryland, 580 A.2d 167, 173-74 (Md. 1990) (Adkins, J., dis- senting). Here, of course, while Officers Mackel, Buie, and Hamel

19

likewise had no specific reason to believe that there were other passengers in the Pathfinder, they did know that there was someone in the vehicle (Stanfield) who, for the reasons earlier recited, potentially might be dangerous.

In contrast to the substantial state interest in having the investigatory detention necessitated by Stanfield's traffic infraction conclude without harm to its law enforcement officials, the liberty and privacy interests which Stanfield attempts to protect are, for the reasons previously discussed, notably insubstantial. Additionally, because, even according to Stanfield, the driver's side window was down when the officers approached the Pathfinder, the interior of Stanfield's car, as well as contents lying exposed on the back seat, were fully open to the view of the officers and passersby.**7**  Even had all of the Pathfinder's windows been raised, the undisputed evidence in the record before us is that Stanfield's tinted windows would not have prevented passersby from viewing the Pathfinder's interior under all lighting conditions. See J.A. at 88. Hence, it was only because of the mere happenstance of cloud cover that the back seat of Stanfield's car was not visible, just as in Texas v. Brown , 460 U.S. 730 (1983), the interior of the open glove compartment was not visible to the officer only because of the happenstance that the stop occurred at night. Therefore, as the district court alternatively held, it is questionable whether Stanfield had any privacy right at all in those portions of his interior passenger compartment relevant in this case, for there is no legitimate expectation of privacy "shielding that portion of the interior of an automobile which may be viewed from outside the vehicle by either inquisitive passersby or diligent police officers." Id. at 740.

---

**7** This fact, of course, suggests that the district court's denial of Stanfield's suppression motion might well be sustainable on the alternative ground that the cocaine would inevitably have been discovered by Officer Buie or Officer Hamel, even had it not been discovered by Officer

Mackel. Where the preponderance of evidence establishes that the infor-
mation would "ultimately or inevitably" have"been discovered by means
wholly independent of any constitutional violation," the inevitable dis-
covery exception to the exclusionary rule allows the prosecution to admit
the evidence obtained through an illegal search. <u>Nix</u> v. <u>Williams</u>, 467
U.S. 431, 443 (1984).

20

Assuming that Stanfield did have some residual privacy interest in the interior compartment of his car, the additional intrusion on that interest that resulted from the mere opening of the passenger door was inconsequential. There is, of course, no comparison between the "se-vere," "surely . . . annoying, frightening, and perhaps humiliating" pat-down of the person authorized by the Court in <u>Terry</u>, 392 U.S. at 24-25, and the incremental additional intrusion on Stanfield's privacy interests affected by the mere opening of his passenger door. Simi-larly, the protective sweep of the home authorized by the Court in <u>Buie</u>, pursuant to which the police were authorized to search closets, showers, attics, studies, basements, and underneath beds, was much more offensive to privacy interests than was the search here. And, obviously, the opening of the car door and perusal of the car's interior from the outside interfered less with Stanfield's privacy interest than would have a complete search of the vehicle's interior permitted under <u>Long</u>, which could have included visual inspection of any area in which a weapon might have been secreted.

We even believe, as explained <u>supra</u>, that the intrusion affected by Officer Mackel's mere opening of the passenger door of Stanfield's Pathfinder was considerably less than those intrusions authorized as a matter of course by the Court in <u>Mimms</u> and <u>Wilson</u>. The opening of the door of the Pathfinder exposed to view little more of Stanfield's body than was already exposed to view through the open driver side window and little more of the interior compartment than was visible through that same window. And, in contrast to the action that may be ordered under <u>Mimms</u> and <u>Wilson</u>, the mere opening of the door did not require Stanfield (nor would it have required any other occupants of the vehicle) to move at all.

In sum, when the state's substantial interest in ensuring that its investigatory detention of Stanfield occurred without incident to its law enforcement agents is weighed in the balance with Stanfield's pri-vacy interests implicated by Officer Mackel's search, there can be no doubt but that the search was reasonable under the circumstances and appropriately limited in scope. What was said of Officer McFadden's

actions in <u>Terry</u> is no less true of Officer Mackel's actions here:

> We cannot say his decision [to open the passenger door to
> Stanfield's Pathfinder in order to determine whether there

21

were other passengers in the vehicle or whether the driver or other had access to weapons] was the product of a volatile or inventive imagination, or was undertaken simply as an act of harassment; the record evidences the tempered act of a policeman who in the course of an investigation had to make a quick decision as to how to protect himself and others from possible danger, and took limited steps to do so.

392 U.S. at 28. To hold otherwise than we do today would be "to require that police officers take unnecessary risks in the performance
of their duties," Terry, 392 U.S. at 23, something which, as the Supreme Court has consistently held, the Constitution does not require.**8**

III.

Because Officer Mackel was engaged in a reasonable protective search when he opened Stanfield's passenger door for the limited pur-
pose of determining whether Stanfield was armed and whether there were any other occupants within the vehicle who might pose a danger to him or his partners, and because the cocaine that Stanfield seeks
to suppress was seen by Officer Mackel in plain view during the con-
duct of this reasonable search, the district court's denial of Stanfield's
motion to suppress is affirmed.

AFFIRMED

_____
**8** Stanfield also argues that the initial seizure of his vehicle was illegal
because the officers stopped his vehicle in order to investigate possible
drug trafficking, not, as the officers contended, because he was in viola-
tion of the state's traffic laws. See supra note 5. Because, as the Supreme
Court has recently held, an officer's subjective state of mind in stopping
a vehicle is irrelevant to the constitutionality of the stop, see Robinette,
117 S. Ct. at 420 ("`Subjective intentions play no role in ordinary,
probable-cause Fourth Amendment analysis.'" (quoting Scott v. United
States, 436 U.S. 128, 138 (1978)); Whren, 116 S. Ct. at 1774 ("[Our]
cases foreclose any argument that the constitutional reasonableness of a
traffic stop depends on the actual motivations of the individual

officers
involved."), the district court was unquestionably correct in rejecting this
argument.