580 A.2d 167

**Jerome Edward BUIE**

v.

**STATE of Maryland.**

**No. 161, Sept. Term, 1987.**

Court of Appeals of Maryland.

Oct. 9, 1990.

John L. Kopolow, Asst. Public Defender, Alan H. Murrell, Public Defender, Baltimore, for petitioner.

Ann N. Bosse, Asst. Atty. Gen., J. Joseph Curran, Jr., Atty. Gen., Baltimore, for respondent.

Argued before MURPHY, C.J., and ELDRIDGE, COLE, RODOWSKY, McAULIFFE, ADKINS * and CHASANOW, JJ.

McAULIFFE, Judge.

In *Buie v. State*, 314 Md. 151, 550 A.2d 79 (1988), this Court held that a warrantless "protective sweep" of the basement of a dwelling house violated rights secured by the Fourth Amendment to the United States Constitution because the police did not have probable cause to believe that there existed exigent circumstances sufficient to support the search. In *Maryland v. Buie*, 494 U.S. ——, 110 S.Ct. 1093, 108 L.Ed.2d 276 (1990), the Supreme Court of the United States held that probable cause is not required to justify a warrantless protective sweep of a dwelling, at least where entry has been gained lawfully. The Supreme Court defined a protective sweep as

a quick and limited search of a premises, incident to an arrest and conducted to protect the safety of police officers or others.

*Id.*, 110 S.Ct. at 1094. Such a search, the Court explained, "is narrowly confined to a cursory visual inspection of those places in which a person might be hiding." *Id.*

██ The Supreme Court rejected the State's argument for a "bright-line rule" that police should be permitted to conduct a protective sweep whenever they make an in-home arrest for a violent crime. Recognizing that a person retains an expectation of privacy in the remaining areas of his home even after the police have validly gained entry and have arrested him, the Court declined to authorize an "automatic" protective sweep. It did, however, consider the

---

* Adkins, J., now retired, participated in the hearing and conference of this case while an active member of this Court; after being recalled pursuant to the Constitution, Article IV, Section 3A, he also participated in the decision.

potential risk to police officers that might result from an in-house arrest. Comparing the circumstances confronting the police in the instant case with the circumstances existing in *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), and *Michigan v. Long*, 463 U.S. 1032, 103 S.Ct. 3469, 77 L.Ed.2d 1201 (1983), the Court said:

> [T]here is an analogous interest of the officers in taking steps to assure themselves that the house in which a suspect is being or has just been arrested is not harboring other persons who are dangerous and who could unexpectedly launch an attack. The risk of danger in the context of an arrest in the home is as great as, if not greater than, it is in an on-the-street or roadside investigatory encounter. A *Terry* or *Long* frisk occurs before a police-citizen confrontation has escalated to the point of arrest. A protective sweep, in contrast, occurs as an adjunct to the serious step of taking a person into custody for the purpose of prosecuting him for a crime. Moreover, unlike an encounter on the street or along a highway, an in-home arrest puts the officer at the disadvantage of being on his adversary's "turf." An ambush in a confined setting of unknown configuration is more to be feared than it is in open, more familiar surroundings.

*Maryland v. Buie*, 110 S.Ct. at 1098. Balancing the competing interests, the Court held that a protective sweep following a lawful in-house arrest is permitted

> when justified by a reasonable, articulable suspicion that the house is harboring a person posing a danger to those on the arrest scene.

110 S.Ct. at 1099.

Applying the standard established by the Supreme Court, we consider the facts presented by the testimony and contained in the record at the time of the suppression hearing which preceded Buie's trial. *Brooks v. State*, 320 Md. 516, 578 A.2d 783 (1990); *Trusty v. State*, 308 Md. 658, 670, 521 A.2d 749 (1987).

Buie was arrested on the first floor of his home. Promptly after Buie's arrest, Detective Joseph Frohlich entered the basement, from whence Buie had emerged just prior to his arrest, "in case there was someone else in the basement." While walking through the basement, Frohlich noticed a red running suit that fit the description of a jumpsuit worn by one of the robbers. He seized it, and it was used against Buie at trial. It is not disputed that if Frohlich's entry into the basement was lawful, the seizure of the red running suit, which was in plain view and which the officer had probable cause to believe was evidence of a crime, was also lawful under the Fourth Amendment. *Maryland v. Buie*, 110 S.Ct. at 1096; *Arizona v. Hicks*, 480 U.S. 321, 326, 107 S.Ct. 1149, 1153, 94 L.Ed.2d 347 (1987).

The question, then, is whether the police were entitled to conduct a cursory inspection of the basement of Buie's home. The answer depends upon whether the facts known to the police, and the inferences fairly deducible therefrom, support a reasonable suspicion that the house harbored a person who posed a danger to those on the arrest scene. In considering this question, we must first determine whether the presence of "reasonable suspicion" must be tested from the view of the particular police officers involved, or from the view of a reasonable police officer under the same circumstances, or a combination of the two. Buie argues the State must show that the officers had a subjective belief that there was a dangerous individual in the basement, and that this belief must have been objectively reasonable. The State insists an objectively reasonable belief is sufficient.

From the Supreme Court's *Buie*, it is not easy to tell whether the established standard is subjective or objective. In the opening paragraph of its opinion the Court concludes "that the Fourth Amendment would permit the protective sweep undertaken here if the searching officer *'possesse[d]* a reasonable belief based on "specific and articulable facts which, taken together with the rational inferences from those facts, reasonably warrant[ed]" the officer in believing' ... that the area swept harbored an individual posing a

danger to the officer or others." 110 S.Ct. at 1095. (Citation omitted; emphasis supplied.) The language quoted by the Court is from *Long* and *Terry,* and it appears to require that the searching officer actually possess a belief that is reasonable. *Id.* The penultimate sentence of the opinion contains similar language:

The Fourth Amendment permits a properly limited protective sweep in conjunction with an in-home arrest *when the searching officer possesses* a reasonable belief based on specific and articulable facts that the area to be swept harbors an individual posing a danger to those on the arrest scene. (Emphasis supplied.)

110 S.Ct. at 1099–1100.

On the other hand, elsewhere the Court states its holding thus:

There must be articulable facts which, taken together with the rational inferences from those facts, *would warrant a reasonably prudent officer in believing* that the area to be swept harbors an individual posing a danger to those on the arrest scene. (Emphasis supplied.)

110 S.Ct. at 1098. This passage seems to point to an objective standard.

Although *Long* and *Terry* contain language that refers to the belief of the police officer, each case employs the same test:

The issue is whether a reasonably prudent man in the circumstances would be warranted in the belief that his safety or that of others was in danger.

*Long,* 463 U.S. at 1050, 103 S.Ct. at 3481, quoting *Terry,* 392 U.S. at 27, 88 S.Ct. at 1883.

Buie cites *Stackhouse v. State,* 298 Md. 203, 468 A.2d 333 (1983), to bolster his argument. It appears to do so. In that case the State argued that a sweep was justified because Stackhouse's sister was on the premises. We observed that "in determining the lawfulness of the search we may concern ourselves only with what the police officers believed at the time." *Id.* at 220, 468 A.2d at 342. And we

noted "that at the time of the search ... the officers [did not] believe [ ] that the sister presented a threat of the destruction of evidence." *Id.* *See also Simpler v. State,* 318 Md. 311, 316–20, 568 A.2d 22 (1990) and cases there cited. Much of the language in *Simpler* suggests that a subjective standard is being applied.

Other cases, however, indicate that an objective standard should be used in Fourth Amendment situations. In *Maryland v. Macon,* the Supreme Court stated:

Whether a Fourth Amendment violation has occurred "turns on an objective assessment of the officer's actions in light of the facts and circumstances confronting him at the time," *Scott v. United States,* 436 U.S. 128, 136 [, 98 S.Ct. 1717, 1723, 56 L.Ed.2d 168] (1978), and not on the officer's actual state of mind at the time the challenged action was taken.

472 U.S. 463, 470–71, 105 S.Ct. 2778, 2783, 86 L.Ed.2d 370 (1985). In *Scott,* the Court commented "that the fact that the officer does not have the state of mind which is [hypothesized] by the reasons which provide the legal justification for the officer's action does not invalidate the action taken as long as the circumstances, viewed objectively, justify that action." 436 U.S. at 138, 98 S.Ct. at 1723. And this Term, Justice Stevens, writing for the Court in *Horton v. California,* 495 U.S. ——, 110 S.Ct. 2301, 2308–09, 110 L.Ed.2d 112 (1990), stated that

evenhanded law enforcement is best achieved by the application of objective standards of conduct, rather than standards that depend upon the subjective state of mind of the officer. The fact that an officer is interested in an item of evidence and fully expects to find it in the course of a search should not invalidate its seizure if the search is confined in area and duration by ... a valid exception to the warrant requirement.

The Supreme Court has expressed similar sentiments in other Fourth Amendment cases. *See, e.g., Graham v. Connor,* 490 U.S. 386, 109 S.Ct. 1865, 1872, 104 L.Ed.2d 443 (1989) ("As in other Fourth Amendment contexts ...

the 'reasonableness' inquiry in an excessive force case is an objective one...."); *Michigan v. Chesternut,* 486 U.S. 567, 573, 108 S.Ct. 1975, 1979, 100 L.Ed.2d 565 (1988) (objective standards used to determine whether reasonable person, in view of circumstances, would have believed he or she was free to leave). *See also Herod v. State,* 311 Md. 288, 299, 534 A.2d 362 (1987) (officer's subjective legal interpretation of basis for warrantless search is not controlling).

We conclude that in determining the existence of reasonable suspicion in a case such as this, the objective standard must be used.[1]  The Supreme Court in this case spoke specifically of the use of an objective standard when it said "[t]his is no more and no less than was required in *Terry* and *Long....*"  *Maryland v. Buie,* 110 S.Ct. at 1098.  The experience and training of the particular police officers involved will form a part of the matrix of facts that define the circumstances which must be considered, but the test is whether a reasonably prudent police officer, under those circumstances, is justified in forming a reasonable suspicion that the house is harboring a person posing danger to those on the arrest scene.  110 S.Ct. at 1099.

▋ Applying that standard to the facts of this case, we hold that the limited search of the basement was lawful.

The police went into Buie's home to arrest him for the perpetration of a dangerous felony—armed robbery—which had been committed within the preceding 48 hours.  The victim of the robbery had promptly identified the perpetrators, and warrants for Buie and Allen were obtained on the day of the offense.  The police placed Buie's house under surveillance for two days, and it is a fair inference that they

---

1.  We need not here consider whether proof by the defendant that an officer undertook a search in bad faith, i.e., believing he had no right to do so, would result in suppression of the fruits of a search that was objectively reasonable.  There is no evidence of bad faith in this case. Rather, as we have noted, Frohlich testified that he went into the basement to see if someone else was there.

did not observe Buie or Allen during that time.[2]

Buie was arrested under circumstances that support a fair inference that he was hiding in the basement. Initial entry was made by at least four officers. One of them, Sergeant Dunn, yelled down into the basement, but received no response. When Corporal Rozar arrived, he assumed control of the interior entrance to the basement. Pointing his service revolver down the stairs, he "yelled down to the basement for anyone down there to come out." He received no reply. He yelled again, and finally heard a voice in the basement inquire "who is it?" Corporal Rozar identified himself and ordered the person in the basement to show his hands. Apparently, there was no response to this command. Corporal Rozar had to repeat the command twice more before he "finally ... saw a pair of hands come around the bottom of the stairs." Buie ascended the stairs at gunpoint and was immediately arrested, handcuffed, and searched. No weapon was found.

Detective Frolich was present at the top of the stairs and observed the arrest of Buie. Frolich then descended the stairs, "in case there was someone else in the basement." There is no evidence in this record that Buie had been taken out of the house before Frolich entered the basement. Frolich's testimony suggests his entry into the basement was immediate:

PROSECUTOR: And were you present when [the arrest of Buie] took place?

FROLICH: Yes, sir.

PROSECUTOR: Okay. Did you see Officer Rozar place the handcuffs on Mr. Buie?

FROLICH: Yes, sir, I did.

PROSECUTOR: After that was done, did you take any action?

FROLICH: Yes, sir, I did.

---

**2.** The police testified that they learned Buie was at home through a pretext telephone call placed just prior to their entry.

PROSECUTOR: What did you do?

FROLICH: I entered the basement of the residence where the defendant Jerome Buie had exited.

Detective Frolich was the original investigating officer in the armed robbery case. He reasonably believed that Buie and Allen had perpetrated the robbery. On the day of the offense, he had obtained warrants for the arrest of both of them. He had been looking for them during the two days that followed the robbery, and had placed Buie's home under surveillance. When Buie was found in his home 48 hours after the robbery, and had not been seen to enter the home during the time it was under surveillance, Frolich was entitled to reasonably suspect that Buie had come to his home shortly after the robbery, and that he had been hiding out there ever since. Buie's actions in the basement heightened the suspicion that he was in hiding. It was entirely reasonable, at that point, for Frolich to suspect that Allen might well have come to Buie's house with him after the robbery, and might well be in the basement. Moreover, Frolich knew that Buie had used a gun in the robbery,[3] and the gun had not been found when Buie was arrested.

The Supreme Court has said that "[t]he concept of reasonable suspicion, like probable cause, is not 'readily, or even usefully, reduced to a neat set of legal rules.' " *United States v. Sokolow*, 490 U.S. 1, 109 S.Ct. 1581, 1585, 104 L.Ed.2d 1 (1989), quoting *Illinois v. Gates*, 462 U.S. 213, 232, 103 S.Ct. 2317, 2329, 76 L.Ed.2d 527 (1983).

Concerning the application of the more demanding standard of probable cause, the Supreme Court has said:

In dealing with probable cause, however, as the very name implies, we deal with probabilities. These are not technical; they are the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act.

---

**3.** Detective Frolich completed the application for the statement of charges, which is a part of the record. His affidavit discloses that the robbery was at gunpoint, and that the gun was held by Buie.

*Brinegar v. United States,* 338 U.S. 160, 175, 69 S.Ct. 1302, 1310, 93 L.Ed. 1879 (1949). Certainly the same non-technical and practical approach should be taken when the lesser standard of reasonable suspicion is applicable.

Keeping in mind that the test is one of reasonable suspicion, and not of proof beyond a reasonable doubt or even of probable cause, and adopting a practical and non-technical approach, it seems clear that a prudent police officer in Frolich's position could reasonably suspect that the basement harbored an individual who posed a danger to those on the arrest scene, and thus he was justified in conducting a cursory sweep of that area to neutralize the danger.

The Court of Special Appeals correctly affirmed the conviction below.

JUDGMENT OF THE COURT OF SPECIAL APPEALS AFFIRMED, WITH COSTS.

CHASANOW, J., concurs in the result.

ADKINS, Judge, dissenting.

In *Buie v. Maryland,* 494 U.S. ——, ——, 110 S.Ct. 1093, 1096, 108 L.Ed.2d 276, 283 (1990) the State importuned the Supreme Court to construe the fourth amendment to the United States Constitution as permitting a warrantless "protective sweep whenever [police] make an in-home arrest for a violent crime." The Supreme Court rejected that request. 494 U.S. at —— n. 2, 110 S.Ct. at 1098 n. 2, 108 L.Ed.2d at 286 n. 2. Because a majority of this Court now has given the State what the Supreme Court refused it, I respectfully dissent.

To begin with, I am distinctly uncomfortable with the majority's conclusion that the reasonable suspicion necessary to justify a protective sweep may be based on a purely objective standard. See at p. 703. That sweeping holding would validate a sweep executed in the most cynical bad faith, provided only that sufficient facts existed to satisfy the majority's rather liberal notions of objective reasonableness. But I shall not belabor that point, for in my view this

case does not require the Court to address that question. If subjectively held articulable suspicion is required, in addition to suspicion that is objectively reasonable, the sweep here was clearly impermissible. The majority does not argue to the contrary. But even if only an objective test is called for, the facts here do not meet it. I shall rehearse the pertinent facts in somewhat more detail than the majority, keeping in mind that what the police officers said they subjectively believed has considerable bearing on what a reasonable officer's objective beliefs might be, under the circumstances.

I.

Jerome Buie and an accomplice, Lloyd Allen, were allegedly involved in an armed robbery of a Godfather's Pizza store on 3 February 1986. The Prince George's County Police Department obtained arrest warrants for the two men. The warrant for Buie's arrest was issued on 3 February, and the police began surveillance of Buie's home that day. The police arrested Buie on 5 February 1986, between 3:00 and 4:00 o'clock in the afternoon. Police Corporal Rozar testified that when the police arrested Buie they had been working surveillance at Buie's home "for about three days," "trying to locate a suspect in a robbery."

The day of the arrest Detective Frolich had one of the police secretaries call Buie's home and ask for him. A female answered the phone, but a man came to the phone when the caller requested Buie. Following the call seven officers went to Buie's house to execute the arrest warrant for Buie. Detective Frolich had that arrest warrant, but none of the officers had a search warrant.

When Corporal Rozar arrived at the scene two officers were outside and four officers were already in the house. Rozar testified that there was a female on the front steps. When Rozar entered the house one officer informed him that he had called into the basement but received no response, the officers had cleared only the main floor, and

that he was about to check the upstairs. Corporal Rozar offered to "freeze" the basement; he posted himself at the top of the basement stairs with a revolver drawn, so that if someone was in the basement he or she could not come up behind the officers. Rozar twice "yelled down to the basement for anyone there to come out." When a voice from below asked who was calling, the officer said it was the police and directed the man to come up the steps with his hands showing. Buie, for it was he, responded to that request peacefully.

Rozar put Buie up against the hallway wall and searched him, but he did not discover any weapons or other significant items on him. The officer did not search the immediate area at that time, nor did he search any part of the house. When asked by the defense attorney whether he was "worried about there being any danger or anything like that," he responded in the negative.

Detective Frolich testified that after he saw Rozar put the handcuffs on Buie, Frolich entered the basement. In the basement he found a red running suit matching the description given by the robbery victim of a suit worn by one of the robbers. The suit was "in a drying position across a stack of clothing." When Buie's attorney questioned Frolich about what he was looking for when he entered the basement, he answered that he "just went down there in case there was someone else in the basement."

Frolich added that he thought there were "two young girls" sitting in front of the house when he entered the first floor. When asked whether he had "any reason to believe that anyone else was in the house besides Mr. Buie" he responded that, "[h]e had no idea who lived there." Frolich testified that he knew a man and a girl were at the house at the time his secretary called to ask for Buie.

## II.

The State points out that the Supreme Court has recently stated that in *Terry* -stop cases articulable suspicion means

only that " 'some minimal level of objective justification' " is necessary to make the stop. *United States v. Sokolow,* 490 U.S. 1, ——, 109 S.Ct. 1581, 1585, 104 L.Ed.2d 1, 10 (1989) (quoting *INS v. Delgado,* 466 U.S. 210, 217, 104 S.Ct. 1758, 1763, 80 L.Ed.2d 247, 232 (1984)). The Court also noted in *Sokolow,* however, that "[t]he officer, of course, must be able to articulate something more than an 'inchoate and unparticularized suspicion or hunch.' " 490 U.S. at ——, 109 S.Ct. at 1585, 104 L.Ed.2d at 10 (quoting *Terry,* 392 U.S. at 27, 88 S.Ct. at 1883, 20 L.Ed.2d at 909). The court must consider all of the circumstances together in determining whether the police had reason to believe that danger was lurking. *Sokolow,* 490 U.S. at ——, 109 S.Ct. at 1585, 104 L.Ed.2d at 10. The burden is on the State at the suppression hearing to establish that a protective sweep was warranted. *See Simpler v. State,* 318 Md. 311, 322, 568 A.2d 22, 27 (1990); *Stackhouse v. State,* 298 Md. 203, 220, 468 A.2d 333, 342 (1983).

A review of the facts established at the suppression hearing leads me to the conclusion that the State failed to meet its burden. Essentially all that the State showed at the suppression hearing was that Buie allegedly committed an armed robbery of a Godfather's Pizza, that Buie had a male accomplice, that a female answered the phone when Detective Frolich's secretary called Buie's home, and that Detective Frolich "didn't know who lived in the house." It appears that the police were operating on "hunches" and nothing more.

We know nothing of Buie's alleged accomplice, Lloyd Allen, except his name and that an arrest warrant was issued for him on 3 February. From the information elicited at the suppression hearing, we do not know whether Allen had been arrested or was still at large. The testimony at the hearing does not give any indication that Allen was seen entering or leaving Buie's home during the three day surveillance period. In fact there was no testimony that placed Allen at Buie's home at any time prior to Buie's arrest. Neither is there information as to what type of

relationship Buie and Allen had; that is, we do not know whether they were long-time friends who spent a great deal of time together or whether the only time they were ever together was the night of the alleged robbery.

The inconclusive surveillance (inconclusive, at least, on this record) does not help the State. It surely does not permit the inference that the police thought Allen was at Buie's house, for if they had believed that they would have brought along his arrest warrant as well as Buie's. The record does not show that they possessed Allen's warrant. At best, we may infer that this surveillance indicated Buie's probable presence at his residence.

As for the robbery being an "armed robbery", we certainly do not know whether the weapon used for the robbery was in the house, or whether any weapons were in the house. We do not know whether Allen or Buie carried the weapon the night of the robbery, or whether either of them habitually carried a weapon.[1] Even if there was a weapon in the house, after his arrest Buie no longer had access to it, so there would have to be some showing that someone who posed a danger to the police had access to a weapon.

The State argues that the female who answered the phone when Detective Frolich's secretary called was "a potentially dangerous" individual. Yet there is nothing to show who this female was, how old she was, or her relationship, if any, to Buie. It is possible that she was one of the "two girls" that the police saw on the porch at the time they entered Buie's house. There is nothing to suggest that these "girls," or the unidentified female, were actually or even potentially dangerous.

---

1.  The majority's argument that Detective Frolich knew that Buie used a gun in the robbery is based upon information that was not presented to or considered by the court at the suppression hearing, and is thus unavailable for use here. *Trusty v. State,* 308 Md. 658, 670, 521 A.2d 749, 755 (1988). But even if it were permissible to assume that Frolich knew Buie had had a gun several days earlier at the robbery, there was nothing but "hunch" to suggest that with Buie in custody, there was any potentially dangerous person in the house.

The majority highlights the fact that Buie did not come out of the basement when Rozar first called into the basement; instead Rozar called out several times before Buie responded. This, it is said, indicates that Buie was hiding and that someone else might have been hiding, too. This supposed delay in response hardly gives rise to the reasonable belief that a dangerous individual was in the basement. We do not know how rapidly Rozar called out, or how much time elapsed before Buie answered. We do know that when Buie did respond he peacefully ascended the stairs, offering no resistance at all.

We know, too, that the situation at Buie's home at the time in question did not cause Corporal Rozar to have any apprehension of danger. And, when asked whether he had reason to believe someone besides Buie was in the house Detective Frolich said he "had no idea who lived" at Buie's home. Thus, he could scarcely have had knowledge or even a reasonable suspicion of the presence of any dangerous person there. What is more, if there was a reasonable likelihood that a dangerous individual occupied the basement, a reasonable police officer who so believed might well have "frozen" the area (as did Corporal Rozar) until the police and their prisoner had departed, rather than descending into the zone of danger. *See Buie,* 494 U.S. at ——, 110 S.Ct. at 1100, 108 L.Ed.2d at 288 (Stevens, J., concurring).

Finally, except for the fact that stairs led down from the first floor of Buie's home to the basement, we have little information about the layout of the dwelling. We cannot tell, for example, if there were other means of ingress to and egress from the basement in addition to the stairs, or whether the basement contained windows from which an assault upon officers on the sidewalk might be made.

A sampling of cases involving protective sweeps does not support the validity of the protective sweep that the police performed in Buie's basement.

In several of these cases the circumstances demonstrated a need for the police to perform a protective sweep. In

*United States v. Baker*, 577 F.2d 1147 (4th Cir.1978), the Court upheld a protective sweep of a house following the arrest of a drug suspect and his cohort outside the former's home. The police had information from the neighbors that one of the arrested men had been seen at the house the previous day and he was armed at that time. *Id.* at 1152. The police also had knowledge of a confederate associated with the man who had been armed, and information that the confederate was with the arrested man the day before. *Id.*

In another drug case, *United States v. Gardner*, 627 F.2d 906 (9th Cir.1980), the court gave several reasons for upholding the warrantless search of the house where the drug suspects were apprehended. One agent had seen weapons during an initial search of the house, making it reasonable for him to conclude that violence could potentially erupt. *Id.* at 911. Officers who had the house under surveillance had seen one of the suspects disappear from the house and reappear on the street some distance from the house. *Id.* The lower court found that it was quite possible for someone to enter the house from the back undetected. These facts gave the officers reason to believe that undetected access to or exit from the house was possible.

In *United States v. Bernard*, 757 F.2d 1439 (4th Cir. 1985), the court upheld the protective search of a house during the seizure of some marijuana fields. Facts supporting this result included: the officers' recent experiences with dangerous booby traps when securing marijuana fields; the officers had seen another person from their helicopter surveillance and when they questioned the suspects on the ground about that missing person they received answers inconsistent with what they had seen; the commercial nature and value of the crop; evidence of recently harvested marijuana plants; and the officers' encounter with a Doberman Pincher in the immediate area. *Id.* at 1443.

In another drug-related case, *United States v. Castillo*, 866 F.2d 1071 (9th Cir.1988), a protective sweep was upheld because the knowledge that the narcotics officers had at the

time of the search justified it. The officers testified that it was their experience that cocaine dealers "had a tendency to carry weapons and would resort to violence." *Id.* at 1080. One of the suspect's co-conspirators had hired an assassin to kill one of the undercover agents if it turned out that he was a law-enforcement officer. *Id.* at 1081. The arresting officers were also aware that several persons were part of the suspect's conspiracy. *Id.*

This Court recently addressed the adequacy of information necessary to sustain a *Terry* stop. In *Quince v. State,* 319 Md. 430, 572 A.2d 1086 (1990), we held that a gun recovered during a "pat-down" search of the defendant during the stop, was admissible evidence. The arresting officer had been told to respond to a complaint from a dining hall manager that there was a man with a gun on the premises. *Id.* at 434, 572 A.2d at 1088. The manager "knew" the man carried a gun because other employees told him so. *Id.* at 432, 572 A.2d at 1087. When the officer spotted the defendant at a bus stop down the road he was able to match up several identifying characteristics reported by the complainant. *Id.* at 435, 572 A.2d at 1088–1089. There was enough articulable suspicion to support the stop and subsequent frisk.

In each of these cases, there were relatively hard and specific facts from which a reasonable police officer could have inferred the presence of danger sufficient to justify a protective sweep, or a stop-and-frisk. The record before the Court in this case is barren of facts of this kind. We are asked to permit the sweep based on speculation, "hunches," and "inchoate and unparticularized suspicion." But this, as *Buie* itself teaches, cannot be done. 494 U.S. at ——, 110 S.Ct. at 1097, 108 L.Ed.2d at 285.

What the State's argument boils down to is that it is possible that dangerous people may be in an arrestee's home when the police come to arrest him or her, and so protective sweeps always should be allowed. The premise is correct—many things are theoretically possible. But to allow a protective sweep based on that notion is to allow a

protective sweep whenever the police go to a home to make an arrest. As I have already pointed out, the Supreme Court's *Buie* rejects that proposition.

I would hold that the record in this case fails to show that a reasonable police officer could have possessed a reasonable belief, based on specific and articulable facts, that Buie's house harbored an individual posing a danger to those on the arrest scene. The protective sweep violated the fourth amendment. The red running suit seized as a result thereof should have been suppressed. The judgment of the Court of Special Appeals should be reversed.

ELDRIDGE and COLE, JJ., join in this dissent.