792 A.2d 1185

**Rashida C. DASHIELL,**

v.

**STATE of Maryland.**

**No. 1182, Sept. Term, 2001.**

Court of Special Appeals of Maryland.

March 5, 2002.

Stacy W. McCormack, Asst. Public Defender (Stephen E. Harris, Public Defender, on the brief), Baltimore, for appellant.

Rachel Marblestone Kamins, Asst. Atty. Gen. (J. Joseph Curran, Jr., Atty. Gen., Baltimore, and Davis R. Ruark, State's Atty. for Wicomico County, Salisbury, on the brief), for appellee.

Argued before JAMES R. EYLER, GREENE, LAWRENCE F. RODOWSKY (Ret., specially assigned), JJ.

JAMES R. EYLER, Judge.

The Circuit Court for Wicomico County convicted Rashida C. Dashiell, appellant, of two counts of possession of cocaine with intent to distribute, possession of cocaine, and possession of marijuana. The court denied appellant's motion to suppress the drugs discovered on her person during the execution of a search warrant. Appellant contends the court erred because the police violated her Fourth Amendment right by conducting a frisk or pat-down absent articulable suspicion that she was armed and dangerous.

## Background

The Wicomico County Narcotics Task Force conducted a four-month narcotics investigation of Brewington Holton Bivens. On January 11, 2001, the police submitted an application for a search and seizure warrant. The application alleged that Bivens was concealing controlled dangerous substances (CDS) at 907 Booth Street, Apartment # 1 (Booth Street), and 1113 Parsons Road, Apartment # A (Parsons Road), in Wicomico County. Based on a finding that probable cause existed, the court issued a no-knock warrant to search Booth Street, Parsons Road and Bivens, and seize any CDS.

On January 25, 2001, at approximately 9:00 p.m., the police executed the Booth Street search warrant. Appellant, her two children, and Angela Bower were the only persons present. Appellant was located in the living room. The police entry

team, in the following sequence, rammed the front door to gain entrance, handcuffed appellant and Ms. Bower, secured the apartment, and conducted "pat-downs" for weapons. Once the apartment was secure, members of the police task force entered to conduct the search for CDS.

During the pat-down of appellant, an officer felt a plastic bag believed to contain cocaine, but did not remove it. Having been told about the plastic bag, Corporal Michael Kravitz, a member of the task force but not the entry team, approached appellant and stated "one of the State's team members stated that you had something on you." Appellant responded, "yes, the dope." Corporal Kravitz could also see the plastic bag hanging out of appellant's front pocket. Corporal Kravitz then removed the bag which contained cocaine. Appellant was placed under arrest. A subsequent search of appellant revealed another plastic bag containing crack cocaine and marijuana.

The search of the apartment uncovered one bag of marijuana found underneath a sofa cushion in the living room. Appellant was transferred to the police station. During processing, appellant disclosed that Booth Street was her residence. Appellant was charged with possession with intent to distribute the CDS found on her person and inside the apartment.

Appellant filed a motion to suppress the CDS discovered on her person, alleging that the pat-down was illegal. At the hearing on the motion to suppress, Corporal Kravitz testified that based on police policy, when executing a search warrant, all persons are secured and patted-down for weapons. The court denied appellant's motion, finding:

> I don't think those terms ["pat-down" and "search"] can be used interchangeably.

> I agree [the police] can't go in there and search and had they not just patted [appellant] down for weapons, if they had searched [appellant], if they had pulled that out of [appellant's] pocket, that would have been wrong.

> The Court believes that when the officers pursuant to a search warrant enter the premises, they do have the right to secure the people while they search the premises, and

where they are entering pursuant to a search warrant on probable cause that drugs are being—that there is drug trafficking occurring within the premises to permit them to secure these individuals while the search pursuant to a warrant was being conducted without giving them the [concurrent] right to pat down for weapons would be pure folly. If you can secure them, certainly think you can determine that they do have no weapons to injure those persons in the premises, so I am going to rule that the officers did have the right to pat down. Once they patted down, another officer determined that or talked to her and she said it was the dope in her pocket and they could see the plastic bag sticking out of her pocket, I believe at that point they had probable cause to seize that property.

### Discussion

When a motion to suppress has been denied, an appellate court shall consider the facts in the light most favorable to the State, the prevailing party. *See Wilkes v. State*, 364 Md. 554, 569, 774 A.2d 420 (2001); *Cartnail v. State*, 359 Md. 272, 282, 753 A.2d 519 (2000); *Simpler v. State*, 318 Md. 311, 312, 568 A.2d 22 (1990). Our review is limited to the facts presented at the time of the suppression hearing. *See Wengert v. State*, 364 Md. 76, 80, 771 A.2d 389 (2001); *Buie v. State*, 320 Md. 696, 699, 580 A.2d 167 (1990); *Trusty v. State*, 308 Md. 658, 670, 521 A.2d 749 (1987). Because appellant has alleged a violation of her Fourth Amendment right, we must make our own independent constitutional appraisal by reviewing the law and applying it to the facts. *See Jones v. State*, 343 Md. 448, 457, 682 A.2d 248 (1996); *Aguilar v. State*, 88 Md.App. 276, 282, 594 A.2d 1167 (1991).

The protections of the Fourth Amendment against unreasonable searches and seizures are applicable to the States through the Fourteenth Amendment.[1] The exclusion-

---

1. "The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated. . . ." U.S. Const. amend. IV.

ary rule provides that evidence discovered in contravention of the Fourth Amendment is inadmissible. *See Mapp v. Ohio,* 367 U.S. 643, 81 S.Ct. 1684, 6 L.Ed.2d 1081 (1961).

In *Terry v. Ohio,* 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), the Supreme Court held that, under certain circumstances, police officers can conduct a stop and frisk of a criminal suspect. A suspect may be stopped or detained when there are specific facts producing rational inferences that criminal activity may be afoot. *Terry,* 392 U.S. at 30, 88 S.Ct. 1868. Similarly, if articulable facts support a reasonable suspicion that the suspect poses a danger, the officer may conduct a limited frisk or pat-down. *Id.* at 27, 88 S.Ct. 1868. The measure of reasonableness for a stop and frisk is often defined as "suspicion," "reasonable suspicion," or "reason to believe," *Payne v. State,* 65 Md.App. 566, 569, 501 A.2d 484 (1985), and is less demanding than probable cause. *See United States v. Sokolow,* 490 U.S. 1, 7, 109 S.Ct. 1581, 104 L.Ed.2d 1 (1989). At a minimum, reasonable suspicion must be based on more than an inchoate and unparticularized suspicion or hunch. *See Terry,* 392 U.S. at 27, 88 S.Ct. 1868; *Anderson v. State,* 282 Md. 701, 702, 387 A.2d 281 (1978). The fundamental test for determining reasonableness is the balancing of the need for governmental intrusion against the nature and quality of the personal invasion. *See Terry,* 392 U.S. at 21, 88 S.Ct. 1868; *In re David S.,* 367 Md. 523, 532–33, 789 A.2d 607 (2002).

A stop is a separate intrusion from a frisk. *See Payne v. State,* 65 Md.App. 566, 569–70, 501 A.2d 484 (1985). "Although a reasonable 'stop' is a necessary predecessor to a reasonable 'frisk,' a reasonable 'frisk' does not inevitably follow in the wake of every reasonable 'stop.'" *Gibbs v. State,* 18 Md.App. 230, 238–39, 306 A.2d 587 (1973). A frisk requires independent justification, *see Alfred v. State,* 61 Md.App. 647, 664, 487 A.2d 1228 (1985), yet sometimes the same underlying facts that justify a stop may also justify a frisk. *See Quince v. State,* 319 Md. 430, 572 A.2d 1086 (1990) (reasonable suspicion of handgun violation); *Simpler v. State,* 318 Md. 311, 318–19,

568 A.2d 22 (1990) (citing 3 Wayne R. LaFave, *Search and Seizure*, § 9.4(a), at 505–06 (1987)) (reasonable suspicion of a violent crime).

 Even when a frisk is justified, it may be invalid because the police unreasonably exceeded the permissible scope of a frisk.[2] *See Aguilar v. State*, 88 Md.App. 276, 594 A.2d 1167 (1991). In *Terry*, the frisk was limited to a pat-down of the suspect's outer clothing. *Terry*, 392 U.S. at 30, 88 S.Ct. 1868. In subsequent cases, the permissible scope of a frisk was broadened under certain circumstances. *See In re David S.*, 367 Md. 523, 533–34, 789 A.2d 607 (2002). The scope of a frisk may not exceed the bounds of what is minimally necessary to ensure safety, *see State v. Smith*, 345 Md. 460, 465–66, 693 A.2d 749 (1997), and is designed exclusively for detecting offensive weapons. *See Alfred v. State*, 61 Md.App. 647, 669, 487 A.2d 1228 (1985).

 It is well settled that a person's mere proximity to a criminal suspect does not automatically give rise to articulable suspicion or probable cause necessary to conduct a frisk or more extensive search of that person. *See Sibron v. New York*, 392 U.S. 40, 62–63, 88 S.Ct. 1889, 20 L.Ed.2d 917 (1968); *In re Appeal No. 113*, 23 Md.App. 255, 260–61, 326 A.2d 754 (1974).[3] The Supreme Court applied this rationale in *Ybarra v. Illinois*, 444 U.S. 85, 91, 100 S.Ct. 338, 62 L.Ed.2d 238 (1979) ("[A] person's mere propinquity to others independently suspected of criminal activity does not, without more, give rise to probable cause to search that person."). The Court held that the police could not automatically frisk all patrons of the

---

**2.** Appellant raises no objection to the use of force, the scope of the frisk, or the subsequent search other than as affected by the frisk.

**3.** A suspect's proximity to a high crime neighborhood or crime scene does not support a finding of probable cause. *See Lawson v. State*, 120 Md.App. 610, 619–20, 707 A.2d 947 (1998); *Baziz v. State*, 93 Md.App. 285, 297, 612 A.2d 296 (1992) (citing *United States v. Everroad*, 704 F.2d 403, 407 (8th Cir.1983); *United States v. Di Re*, 332 U.S. 581, 593, 68 S.Ct. 222, 92 L.Ed. 210 (1948); *State v. Brazil*, 269 N.W.2d 15 (Minn.1978)).

Aurora Tap Room absent articulable suspicion that the persons were armed or dangerous when executing a search warrant based on probable cause that drugs were being sold there. *Id.* at 93–94, 100 S.Ct. 338.

 Two years after *Ybarra,* the Supreme Court held that when executing a search warrant, the police have the authority to detain occupants of the premises. *Michigan v. Summers,* 452 U.S. 692, 101 S.Ct. 2587, 69 L.Ed.2d 340 (1981). The factors justifying detention include the nature of the "articulable facts" and the interest in minimizing the risk of harm to police. *Summers,* 452 U.S. at 702, 101 S.Ct. 2587. Although the *Summers* Court did not address police frisks, the execution of a search warrant was of prime importance in assessing the reasonableness of the police intrusion. *Id.* at 701, 101 S.Ct. 2587. The Court recognized that "detention represents only an incremental intrusion on personal liberty when the search of a home has been authorized by a valid warrant." *Id.* at 703, 101 S.Ct. 2587. The existence of a search warrant justified detention because of the nexus between the residence where criminal activity was suspected and the occupants found therein, *id.* at 703–04, 101 S.Ct. 2587, and diminished the likelihood that police would contravene the Fourth Amendment and use detention to gather information. *Id.* at 701–02, 101 S.Ct. 2587.

 Ensuring the safety of police officers who confront criminal suspects is an important state interest. *See, e.g., Maryland v. Wilson,* 519 U.S. 408, 117 S.Ct. 882, 137 L.Ed.2d 41 (1997); *Michigan v. Long,* 463 U.S. 1032, 103 S.Ct. 3469, 77 L.Ed.2d 1201 (1983); *Pennsylvania v. Mimms,* 434 U.S. 106, 98 S.Ct. 330, 54 L.Ed.2d 331 (1977); *Adams v. Williams,* 407 U.S. 143, 92 S.Ct. 1921, 32 L.Ed.2d 612 (1972). Chief Justice Warren discussed officer safety during a stop and frisk as follows:

> [T]here is the more immediate interest of the police officer in taking steps to assure himself that the person with whom he is dealing is not armed with a weapon that could unexpectedly and fatally be used against him. Certainly it would be *unreasonable to require that police officers take unnec-*

**essary risks** *in the performance of their duties.* American criminals have a long tradition of armed violence, and every year in this country many law enforcement officers are killed in the line of duty, and thousands more are wounded. Virtually all of these deaths and a substantial portion of the injuries are inflicted with guns and knives.

*Terry,* 392 U.S. at 23, 88 S.Ct. 1868 (emphasis added). The goal of conducting a frisk is to protect the police and bystanders from harm. *See State v. Smith,* 345 Md. 460, 465, 693 A.2d 749 (1997). "The officer need not be absolutely certain that the individual is armed; *the issue is whether a **reasonably prudent** man in the circumstances would be warranted in the belief that his safety or that of others was in danger."* *Terry,* 392 U.S. at 27, 88 S.Ct. 1868 (emphasis added).

 The touchstone of the Fourth Amendment is reasonableness. *See Florida v. Jimeno,* 500 U.S. 248, 250, 111 S.Ct. 1801, 114 L.Ed.2d 297 (1991). The actual motivations or subjective beliefs of police officers do not determine reasonableness. *See Cartnail v. State,* 359 Md. 272, 289, 753 A.2d 519 (2000). Rather, an objective standard is applied. *See Ohio v. Robinette,* 519 U.S. 33, 39, 117 S.Ct. 417, 136 L.Ed.2d 347 (1996).[4] To decide whether a reasonably prudent person in the officer's position would be warranted in believing his or her safety or that of others were in danger, we examine the totality of the circumstances, *see Derricott v. State,* 327 Md. 582, 588, 611 A.2d 592 (1992), including the modes or patterns of operations of certain kinds of lawbreakers, information in police reports, *see Stokes v. State,* 362 Md. 407, 416, 765 A.2d

---

**4.** Our analysis is not affected by the fact that the police officer who conducted the pat-down of appellant did not testify at the suppression hearing, because we apply an objective, not a subjective, test. The Court of Appeals expressly adopted an objective standard for measuring the reasonableness of danger to justify a pat-down. *See Buie v. State,* 320 Md. 696, 703, 580 A.2d 167 (1990). The *Buie* Court, quoting the Supreme Court, stated " 'that the fact that the officer does not have the state of mind which is [hypothesized] by the reasons which provide legal justification for the officer's action does not invalidate the action taken as long as the circumstances, viewed objectively, justify that action.' " *Buie,* 320 Md. at 702, 580 A.2d 167 (quoting *Scott v. United States,* 436 U.S. 128, 138, 98 S.Ct. 1717, 56 L.Ed.2d 168 (1978)).

612 (2001)(citing *United States v. Cortez*, 449 U.S. 411, 418, 101 S.Ct. 690, 66 L.Ed.2d 621 (1981)), any rational inferences that police officers are entitled to draw based on their training and experience, *see Terry*, 392 U.S. at 27, 88 S.Ct. 1868, and any other facts or evidence contained in the record at the time of the suppression hearing. *See Brooks v. State*, 320 Md. 516, 578 A.2d 783 (1990). We recognize that there is no litmus test to define the "reasonable suspicion" standard. *See Stokes*, 362 Md. at 415, 765 A.2d 612.[5]

Appellant does not contest the right of the police to detain her while executing the Booth Street search warrant. *See Michigan v. Summers*, 452 U.S. 692, 101 S.Ct. 2587, 69 L.Ed.2d 340 (1981); *Hippler v. State*, 83 Md.App. 325, 574 A.2d 348 (1990).[6] Appellant contends, however, that the police cannot justify a policy of conducting an automatic pat-down of every person on the premises that is named in the search warrant when executing the warrant. We agree. *See Ybarra*, 444 U.S. at 93–94, 100 S.Ct. 338.[7] The constitutionality of a

---

**5.** "The concept of reasonable suspicion, like probable cause, is not 'readily, or even usefully, reduced to a neat set of legal rules.' " *United States v. Sokolow*, 490 U.S. 1, 109 S.Ct. 1581, 104 L.Ed.2d 1 (1989) (quoting *Illinois v. Gates*, 462 U.S. 213, 232, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983)). Reasonable suspicion "is a common sense, nontechnical conception that considers factual and practical aspects of daily life and how reasonable and prudent people act." *Cartnail*, 359 Md. at 287, 753 A.2d 519. *See also id.* at 289, 753 A.2d 519 (adopting Professor LaFave's six factor test for considering if reasonable suspicion exists); *New Jersey v. T.L.O.*, 469 U.S. 325, 346, 105 S.Ct. 733, 83 L.Ed.2d 720 (1985) ("[T]he requirement of reasonable suspicion is not a requirement of absolute certainty: 'sufficient probability, not certainty, is the touchstone of reasonableness ....' ") (quoting *Hill v. California*, 401 U.S. 797, 804, 91 S.Ct. 1106, 28 L.Ed.2d 484 (1971)).

**6.** The Court of Appeals declined to define the scope of term "occupants" as used by the Supreme Court in *Summers*. *Stanford v. State*, 353 Md. 527, 538–39, 727 A.2d 938 (1999). Similarly, we need not decide the issue because appellant satisfies all three definitions discussed in *Stanford*. Appellant was a "resident" of the Booth Street apartment.

**7.** The use of *per se* or bright line rules is generally disfavored in Fourth Amendment jurisprudence. *See Ohio v. Robinette*, 519 U.S. 33, 39, 117 S.Ct. 417, 136 L.Ed.2d 347 (1996).

pat-down depends on the particular facts of each case. *See Terry*, 392 U.S. at 30, 88 S.Ct. 1868; *State v. Smith*, 345 Md. 460, 468, 693 A.2d 749 (1997); *State v. Wilson*, 279 Md. 189, 201, 367 A.2d 1223 (1977). The facts must be viewed collectively and may be sufficient to meet the reasonable suspicion standard even though a particular fact, standing alone, may appear "innocent" and deserving of "little weight." *United States v. Arvizu*, 534 U.S. 266, 122 S.Ct. 744, 750–51, 151 L.Ed.2d 740 (2002) (reversing the Ninth Circuit's finding that seven factors considered individually carried little or no weight and remaining factors were insufficient to justify *Terry* stop because a "divide-and-conquer" analysis of reasonable suspicion was improper).

Looking objectively at the facts known to the police in the case before us, we hold that a reasonably prudent officer would be warranted in believing that his or her safety or that of others was in danger when executing a "no-knock" search warrant at Booth Street. No challenge has been made to the validity of the search warrant. The application for the warrant contained detailed facts supporting the position that CDS was being sold and distributed from Booth Street. The facts were established through information supplied by a confidential informant and concerned citizens, complaints received by police, and two weeks of police surveillance conducted on Booth Street.

We accept the issuing court's finding that probable cause existed to search for CDS. *See e.g. West v. State*, 137 Md.App. 314, 325–26, 768 A.2d 150 (2001) (great deference is paid to probable cause determination). The facts included in the application for the search warrant are deemed credible, reliable, and trustworthy. *See Thompson v. State*, 139 Md. App. 501, 532–33, 776 A.2d 99 (2001) (citing *Franks v. Delaware*, 438 U.S. 154, 171–72, 98 S.Ct. 2674, 57 L.Ed.2d 667 (1978) (affidavits in support of warrant application are presumptively valid)).

The police suspected that Bivens resided at Parsons Road and operated a "stash-house" for CDS at the Booth Street

apartment.[8] The Booth Street neighborhood was recognized by police as a high-traffic drug area or an open-air drug market. Concerned citizens complained to police about the significant volume of foot and vehicle traffic in and around the apartment during both daytime and nighttime hours. The citizens reported that visitors either went inside the apartment or were sometimes met outside at their vehicles. Bivens, who was believed to deal drugs in the community, was identified as the person making contact with the occupants of the vehicles.

During police surveillance, officers observed Bivens, vehicle traffic, and foot traffic coming to and going from the Booth Street apartment. On occasion, Bivens was seen exiting the apartment to approach vehicles parked outside and making brief contact with the occupants before the vehicles departed. The police noted that any visitors remained in or around Booth Street for only a short period of time. Based on police training and experience, the sequence and timing of events reported and observed was consistent with a drug house operation.

The information supplied to police by a few concerned citizens confirmed the suspicion that Booth Street was a stash house. The citizens had personal knowledge that CDS was located and sold there. Of great importance, one person reported that Bivens carried a handgun and that "several" other guns were located inside the apartment. The police knew that Bivens had been charged in the past with drug related and violent offenses and had unsuccessfully attempted to elude police during a routine traffic stop. Taken together, the information convinced the issuing court that there was probable cause to believe that illegal drugs were located inside and being distributed from Booth Street.

As held in *Ybarra* and relied upon by appellant, the mere presence of a suspect at a location being searched

---

8. Based on experience and training, affiants were aware that drug dealers use several residences when dealing CDS to avoid placing too much suspicion on one location. Bivens had given police the Parsons Road address as his residence in the past.

pursuant to a warrant does not automatically justify a pat-down. *Ybarra*, however, does not control the facts before us. The Aurora Tap Room was a public tavern; appellant was inside a private apartment. The distinction is highly relevant. *See, e.g., People v. Thurman*, 209 Cal.App.3d 817, 257 Cal. Rptr. 517 (1989); *State v. Gobely*, 366 N.W.2d 600 (Minn.1985); *In re Andre W.*, 256 Neb. 362, 590 N.W.2d 827 (1999); *State v. Guy*, 172 Wis.2d 86, 492 N.W.2d 311 (1992).

■ There is a greater nexus between persons inside a private residence than bystanders visiting a locale open to the general public. Our analysis in *Sutton v. State*, 128 Md.App. 308, 738 A.2d 286 (1999), is instructive. We recognized that "courts are more likely to uphold warrants authorizing the search of premises and all persons present when the place to be searched is a *private residence* and when police have probable cause to believe drug dealing activity is taking place therein." *Sutton*, 128 Md.App. at 322, 738 A.2d 286 (emphasis in original). A search of "all persons" in a private residence is less likely to entrap the innocent than a search of a public place. *See id.* at 323, 738 A.2d 286. When probable cause exists that drugs are being used or sold at a private residence, it is likely that everyone present is aware of the criminal offense. *See id.* (citing *People v. Easterbrook*, 43 A.D.2d 719, 350 N.Y.S.2d 442 (1973)). *See also United States v. Reid*, 997 F.2d 1576 (D.C.Cir.1993); *State v. Zearley*, 444 N.W.2d 353 (N.D.1989). The application for the Booth Street warrant explicitly mentioned the heavy amounts of foot and vehicle traffic, implying that the nature of the visitors' contact was drug related. *C.f. Ybarra*, 444 U.S. at 87–88, 100 S.Ct. 338 (warrant application silent as to nexus between patrons of Aurora Tap Room and drugs).

■■ The purpose of a frisk or pat-down is to allow officers to pursue investigations without fear of violence. *See Adams v. Williams*, 407 U.S. 143, 146, 92 S.Ct. 1921, 32 L.Ed.2d 612 (1972). An investigation pursuant to a search warrant differs from *Terry* street encounters. *See generally* 2 Wayne R. LaFave, *Search and Seizure*, § 4.9(d), at 636–38 (1996). During a search, the police have a duty to execute a warrant and are focused primarily on the subject of the warrant, *i.e.* the premises or specific subject named in the

warrant. The length of time for the search is more than a momentary encounter; it varies based on the nature of the warrant and size of the property. By contrast, when police investigate suspicious conduct on the street, all attention is on the suspect and the stop or detention must cease when police either confirm or deny their suspicions. *See United States v. Sharpe,* 470 U.S. 675, 105 S.Ct. 1568, 84 L.Ed.2d 605 (1985); *Graham v. State,* 119 Md.App. 444, 467, 705 A.2d 82 (1998).

Different environments increase the likelihood of danger to police, *see Chimel v. California,* 395 U.S. 752, 89 S.Ct. 2034, 23 L.Ed.2d 685 (1969) (custody); *Michigan v. Long,* 463 U.S. 1032, 103 S.Ct. 3469, 77 L.Ed.2d 1201 (1983) (road-side stop), including the dangers associated with a private residence. *See Maryland v. Buie,* 494 U.S. 325, 110 S.Ct. 1093, 108 L.Ed.2d 276 (1990) (in-home arrest). Persons inside a private residence are usually comfortable and familiar with their surroundings. *See Buie,* 494 U.S. 325, 333, 110 S.Ct. 1093 (1990) ("[U]nlike an encounter on the street or along a highway, an in-home arrest puts the officer at the disadvantage of being on his adversary's 'turf.' An ambush in a confined setting of unknown configuration is more to be feared than it is in open, more familiar surroundings."); 2 Wayne R. LaFave, *Search and Seizure,* § 4.9(d), at 637 (1996) (suspect in residence has greater opportunity to reach for hidden weapon). Consequently, these persons are more apt to react to any police intrusions. The uncertain presence of additional persons during the search increases the already present danger to police. From the evidence of constant traffic at Booth Street, it can be inferred that at any time, including January 9th around 9:00 p.m., it was possible that several people could be inside the apartment.

Additionally, the nature of the criminal activity suspected at Booth Street resulted in the issuance of a "no-knock" search warrant.[9] A "no-knock" warrant is utilized

---

**9.** There is no *per se* exception to the knock and announce rule for executing a warrant to search for drugs; rather, a reviewing court must

where exigent circumstances justify not knocking and announcing. *See Lee v. State,* 139 Md.App. 79, 774 A.2d 1183 (2001). Exigent circumstances include a reasonable suspicion that it would be dangerous for police to knock and announce their presence. *See id.* at 89, 774 A.2d 1183 (citing *Richards v. Wisconsin,* 520 U.S. 385, 394, 117 S.Ct. 1416, 137 L.Ed.2d 615 (1997)); *Wynn v. State,* 117 Md.App. 133, 168, 699 A.2d 512 (1997) (officer's safety justified "no-knock" warrant). The knock and announce procedure was not required for Booth Street, in part, because of impending dangers.[10]

 The degree of danger present at Booth Street was compounded by the nature of drug trafficking. *See, e.g., State v. Trine,* 236 Conn. 216, 673 A.2d 1098 (1996).[11] Persons associated with the drug business are prone to carrying weapons. *See Ybarra,* 444 U.S. at 106, 100 S.Ct. 338 (Rehnquist J., dissenting) ("[F]irearms are as much 'tools of the trade' as are most commonly recognized articles of narcotic paraphernalia") (quoting *United States v. Oates,* 560 F.2d 45, 62 (2nd Cir.1977)); *Whiting v. State,* 125 Md.App. 404, 417, 725 A.2d 623 (1999) (nexus between drugs and guns); *Banks v. State,* 84 Md.App. 582, 591, 581 A.2d 439 (1990) ("[O]ne who is involved in distribution of narcotics, it is thought, *a factiori,* would be more prone to possess, and/or use, firearms, or other weapons, than a person not so involved."). The connection of guns and drugs exposes officers to greater risks when con-

---

examine the particular circumstances. *See Lee v. State,* 139 Md.App. 79, 774 A.2d 1183 (2001). Appellant raises no objection to the issuance of a "no-knock" warrant.

**10.** Affiants also sought the "no-knock" provision to prevent evidence from being destroyed.

**11.** Of course, just because a criminal suspect satisfies the drug-courier profile, this, without more, does not give police reasonable suspicion required for a stop and frisk. *See Derricott v. State,* 327 Md. 582, 611 A.2d 592 (1992). Similarly, mere suspicion that a person is involved with illegal drugs, combined with knowledge that drug dealers frequently carry concealed weapons, without more, does not justify a search. *See Aguilar v. State,* 88 Md.App. 276, 287, 594 A.2d 1167 (1991).

fronting suspects who deal drugs. *See Summers,* 452 U.S. at 702, 101 S.Ct. 2587 (even where "no special danger to the police [was] suggested by the evidence in this record, the execution of a warrant to search for narcotics is the kind of transaction that may give rise to sudden violence. . . . The risk of harm to both the police and the occupants is minimized if the officers routinely exercise unquestioned command of the situation."); *People v. Broadie,* 37 N.Y.2d 100, 112, 371 N.Y.S.2d 471, 332 N.E.2d 338 (N.Y.1975) ("Because of their illegal occupation, however, drug traffickers do often commit crimes of violence against law enforcement officers"). In the application for the search warrant, affiants stated they were keenly aware through their training and experience "that individuals in the distribution of controlled dangerous substances . . . carry all types of weapons which puts the officers in danger during the execution of search and seizure warrants."

The *Terry* Court warned against unnecessary police officer risks. *Terry,* 392 U.S. at 23, 88 S.Ct. 1868. In the case before us, for the police to enter and search Booth Street without conducting a pat-down of the persons inside would be contrary to the Court's advice. The balance of reasonableness weighs in favor of permitting the pat-down of appellant. The pat-down was a minimal intrusion on appellant's privacy. A prudent person, under the facts set forth herein, would reasonably believe that persons located inside Booth Street posed a danger sufficient to justify a limited pat-down.

**JUDGMENT AFFIRMED; COSTS TO BE PAID BY APPELLANT.**