Notice: This opinion is subject to formal revision before publication in the Federal Reporter or U.S.App.D.C. Reports. Users are requested to notify the Clerk of any formal errors in order that corrections may be made before the bound volumes go to press.

# United States Court of Appeals

FOR THE DISTRICT OF COLUMBIA CIRCUIT

————

Argued September 10, 2004   Decided October 19, 2004

No. 03-3026

UNITED STATES OF AMERICA,
APPELLEE

v.

ANTHONY L. HOLMES,
APPELLANT

————

Appeal from the United States District Court
for the District of Columbia
(No. 02cr00024–01)

————

*Richard Seligman*, appointed by the court, argued the cause and filed the briefs for appellant.

*John P. Gidez*, Assistant U.S. Attorney, argued the cause for appellee. With him on the briefs were *Kenneth L. Wainstein*, U.S. Attorney, *John R. Fisher*, *Roy W. McLeese, III*, and *Lisa H. Schertler*, Assistant U.S. Attorneys.

————

Bills of costs must be filed within 14 days after entry of judgment. The court looks with disfavor upon motions to file bills of costs out of time.

Before:  SENTELLE, TATEL, and ROBERTS, *Circuit Judges*.

Opinion for the Court filed by *Circuit Judge* ROBERTS.

ROBERTS, *Circuit Judge*: Anthony Holmes appeals from the district court's denial of his motion to suppress evidence seized during a pat-down frisk and a subsequent search incident to arrest.  During the pat-down frisk an officer felt a hard, square object in Holmes' jacket pocket.  Holmes identified the object as a scale, which it turned out to be when the officer removed it.  When the officer proceeded with the frisk, Holmes assaulted him.  Once Holmes had been subdued, the police searched him and found cocaine on his person.  They also found a semi-automatic gun and ammunition beneath the driver's seat of his car.  Holmes argues that the officers violated the Fourth Amendment by removing the scale and that this tainted the subsequent seizure of the cocaine, gun, and ammunition.  He also argues that the search of the car exceeded the legitimate scope of a search incident to arrest.  We find that the scale was seized pursuant to a lawful protective frisk under *Terry v. Ohio*, 392 U.S. 1 (1968), and that the other evidence was properly seized pursuant to a search incident to Holmes' arrest for assault. We affirm.

## I.

At approximately 9:30 p.m. on December 21, 2001, officers Dereck Phillip and Marvin Washington of the Metropolitan Police Department observed a car traveling at a high rate of speed, about 20 miles above the posted speed limit, on Good Hope Road in southeast Washington, D.C.  Officer Phillip pulled up behind the vehicle, which slowed to a speed of 35 miles per hour, still 10 miles per hour above the speed limit. As he followed the vehicle, Phillip observed the driver — Anthony Holmes — continually dipping his right shoulder, as if he were reaching under the driver's seat.  To Phillip, it seemed as if Holmes were "retrieving a weapon from under his seat or . . . placing a weapon under his seat."  Suppression Hr'g Tr. at 8.  Phillip activated his emergency lights.

Holmes "was very hesitant . . . pulling over," but finally did so. *Id.* at 7.

Phillip and his partner exited their patrol car and approached the vehicle. They noticed that Holmes was looking nervously over his left shoulder and moving around inside the car. As a safety precaution, the officers approached the passenger side of the car — where Holmes was not expecting them — and again observed Holmes reaching beneath his seat and toward his waist. Phillip knocked on the passenger side window, and Holmes rolled the automatic window down.

As the window opened, Phillip detected a strong odor of alcohol. He asked Holmes if he had been drinking. Holmes replied that he had, and that he was coming from a liquor store. The officers moved to the driver's side and asked Holmes to exit the vehicle. Around this time a third police officer, Victor Jordan, arrived at the scene.

As he got out of the car, Holmes — who was wearing a large parka — reached several times toward the right rear pocket of his pants. Phillip told him to stop: Holmes' reaching made the officer "awfully nervous," given that Phillip had observed Holmes reaching under the driver's seat in the course of pulling him over. *Id.* at 11–12. As Phillip would later explain, he was "[c]oncerned that [Holmes] could be possibly armed." *Id.* at 12. "It was just a very awkward moment. It was just a suspicious manner. It just didn't feel comfortable at all. . . . He had a huge black and gray jacket on with [a] numerous amount of pockets. I couldn't reveal if he had a weapon or anything." Trial Tr. at 183. The officer "felt a threat level. . . . I assume[d] that he was easily armed." *Id.* at 207.

After briefly complying with the officer's directive, Holmes once again began to reach for his pocket. At this point, while Holmes and the officers were standing at the trunk of the car, Phillip told Holmes that he was going to pat him down. Phillip later testified that he decided on this course because "I felt that he was probably armed." Suppression Hr'g Tr. at 14. Holmes placed his hands on the trunk and allowed Phillip to proceed. During the pat-down, Phillip detected a "hard,"

"square object" in the front left pocket of Holmes' parka. *Id.* at 14. He asked Holmes what the object was, and Holmes said it was a scale. Later, Phillip would testify that, on hearing Holmes' answer, he "just thought [the object] was a scale," and did not think it was a firearm. *Id.* at 14, 32. Phillip removed the object and verified that it was a digital pocket scale. He also noticed a white residue on the scale. Phillip asked Holmes if there was anything else the officers should know about, and Holmes said there was not. *Id.* at 15.

Phillip then resumed the pat-down. Holmes once again moved his right hand toward his back pocket. The officers again advised him to stop, but this time Holmes responded by striking Phillip with his left elbow. A melee ensued, during which Holmes "threw several punches and kicks" at the officers. *Id.* at 16. Following a long struggle, Holmes was restrained and placed in handcuffs.

After they subdued him, the officers searched Holmes' car and found beneath the driver's seat a loaded nine millimeter semi-automatic gun and a bag with 14 rounds of ammunition. They also searched Holmes himself and found 58 empty Ziploc bags and a plastic bag containing crack cocaine.

Officer Jordan drove Holmes to D.C. General Hospital for treatment of minor injuries sustained in the fight. When they arrived at the hospital, Jordan discovered another quantity of cocaine on the floor of the transport van in the area where Holmes had been seated. Jordan would testify that Holmes had been the van's only occupant and that pursuant to established procedure Jordan had inspected the van prior to placing Holmes in it and had not observed anything on the floor. Jordan recovered a third quantity of cocaine from Holmes while searching him in the hospital's cell block. In total, 9.2 grams of cocaine base were seized from Holmes and the floor of the transport van.

A grand jury indicted Holmes for possession of a firearm and ammunition by a convicted felon, in violation of 18 U.S.C. § 922(g)(1); possession with intent to distribute five grams or more of cocaine base, in violation of 21 U.S.C. §§ 841(a)(1) and (b)(1)(B)(iii); and possession of a firearm in furtherance

of a drug trafficking offense, in violation of 18 U.S.C. § 924(c)(1). Holmes filed a motion to suppress all the physical evidence seized on the night in question. The district court denied the motion. The court noted that "there has been a great deal of case law that has examined when ... items are seized unreasonably and no two cases are the same." Suppression Hr'g Tr. at 56. The court concluded that "[i]n this judicial officer's view it simply cannot be said that any of the actions of the police on the basis of what they saw was unreasonable." *Id.* The court held that the officers had proper grounds to stop and frisk Holmes and had probable cause to search him incident to his arrest for assaulting them. *Id.* at 57–58. Holmes was convicted on all counts and now appeals the denial of his motion to suppress.

## II.

Holmes contends that the government subjected him to an unreasonable search and seizure, in violation of the Fourth Amendment, when Officer Phillip removed the digital scale. He also maintains that evidence seized after the fight should be suppressed as fruits of that illegal seizure. Finally, he argues that the officers were not authorized to search his car incident to the arrest for assault.

In response, the government maintains that the seizure of the scale was lawful under *Terry v. Ohio*, 392 U.S. 1 (1968). Regarding the search of the car, the government relies on *New York v. Belton*, 453 U.S. 454 (1981), and *Thornton v. United States*, 124 S. Ct. 2127 (2004), which allow police to search the passenger compartment of an automobile incident to the arrest of a recent occupant.

We review de novo the district court's determination of questions of law and its conclusions regarding reasonable suspicion and probable cause. *See Ornelas v. United States*, 517 U.S. 690, 699 (1996); *United States v. Christian*, 187 F.3d 663, 666 (D.C. Cir. 1999). At the same time, the Supreme Court has "hasten[ed] to point out that a reviewing court should take care both to review findings of historical fact only for clear error and to give due weight to inferences drawn

from those facts by resident judges and local law enforcement officers." *Ornelas*, 517 U.S. at 699. We also defer to the district court's determination of witness credibility. *See Christian*, 187 F.3d at 666.

**A.** This case comes down to one question: given all the foregoing facts, did Officer Phillip act unreasonably when he removed the hard, square object from Holmes' jacket pocket during the course of the frisk? There is no dispute that Phillip lawfully stopped Holmes for a traffic infraction. *See United States v. Mitchell*, 951 F.2d 1291, 1295 (D.C. Cir. 1991). Nor is there any dispute that Phillip was justified in undertaking a frisk or pat-down of Holmes. Under *Terry* and its progeny, a police officer may perform a protective frisk if he has reason to believe, based on "specific and articulable facts . . . taken together with rational inferences from those facts," that "he is dealing with an armed and dangerous individual." *Terry*, 392 U.S. at 21, 27. During the traffic stop, Phillip observed Holmes reaching under his seat as if to hide or retrieve a weapon. Holmes admitted that he had been drinking. Once out of the car, Holmes kept reaching for his back pocket despite continued warnings from the officers. These circumstances certainly gave Phillip ample reason to be "awfully nervous" and "concerned that [Holmes] could be . . . armed." Suppression Hr'g Tr. at 11–12.

The contested issue is whether Officer Phillip acted unreasonably in taking out the hard, square object he felt in Holmes' parka pocket. The Court in *Terry* explained that the scope of a protective frisk "must be limited to that which is necessary for the discovery of weapons which might be used to harm the officer or others nearby." 392 U.S. at 26. Holmes argues that he told the officer that the object was a scale, that Phillip thought it was a scale, and therefore there was no threat to the officers' safety that justified removing it. Indeed, Phillip testified that he did not think the object was a firearm. Suppression Hr'g Tr. at 32.

To the extent this argument is based on Officer Phillip's personal motivations for removing the scale, it misses the point. The propriety of a search under the Fourth Amend-

ment depends on "an objective assessment of the officer's actions in light of the facts and circumstances confronting him at the time," *Scott v. United States*, 436 U.S. 128, 136 (1978), and not on the officer's own subjective intent in executing the search. *See Whren v. United States*, 517 U.S. 806, 812–13 (1996); *United States v. Rocky Brown*, 334 F.3d 1161, 1166–67 (D.C. Cir. 2003). The fact that Phillip failed to testify that he thought the object was a weapon, or the fact that he apparently believed the item was a scale, does not determine our inquiry. *See United States v. Monte Brown*, 374 F.3d 1326, 1327 (D.C. Cir. 2004) (finding probable cause to search trunk in light of inferences from items found in passenger compartment, even though officer "said nothing about what the items found in the passenger compartment signified to him"); *United States v. Swann*, 149 F.3d 271, 272 (4th Cir. 1998) ("Although the searching officer did not testify that he believed the item in Swann's sock to be a weapon when he removed it, a reasonable officer in his circumstances could well have believed that the item was a weapon . . . and therefore the seizure did not exceed the permissible bounds of a *Terry* stop.").

The only relevant question is whether a reasonable officer, knowing what Phillip knew at the moment of seizure, would have been justified in removing the scale. Under these circumstances, we hold that he would have been. Recollect what Officer Phillip knew as he began to frisk Holmes: Holmes had been very hesitant to pull over in the first place. While in the automobile, he had repeatedly reached under the driver's seat, as if to retrieve a weapon. He had been drinking. Once out of the car, he continuously reached for his pocket — despite repeatedly being directed not to do so. He was wearing a "huge" jacket with "numerous" pockets. Officer Phillip was fully justified in being "awfully nervous" as he began the frisk. Suppression Hr'g Tr. at 11.

Then he felt the hard object in one of these numerous pockets. Holmes said it was a scale. Officer Phillip thought it was. But the Fourth Amendment does not require the officer to gamble his safety and that of those around him on the accuracy of such assumptions. The officer did not have to

take Holmes at his word that the object was a scale, and proceed with the frisk solely on that basis. We cannot fault the officer for taking the simple step of checking to ensure that the hard object was not something more threatening before continuing. The object did not feel like a firearm, but it could have been another type of weapon — a box cutter, for example. *See Swann*, 149 F.3d at 272 (reasonable for officer to believe hard object in defendant's sock, which turned out to be credit cards bound together, could have been a box cutter).

Moreover, the scope of a *Terry* frisk is not limited to weapons, but rather to "concealed objects which *might* be used as instruments of assault." *Sibron v. New York*, 392 U.S. 40, 65 (1968) (emphasis added). A hard, square object would seem to fit that description well. Other courts have admitted items that strike us as less likely instruments of assault than the scale at issue here. *See United States v. Rahman*, 189 F.3d 88, 120 (2d Cir. 1999) (envelope containing fraudulent passports); *United States ex rel. McNeil v. Rundle*, 325 F. Supp. 672, 677 (E.D. Pa. 1971) (watch).

The Supreme Court has recognized that "traffic stops may be dangerous encounters." *Maryland v. Wilson*, 519 U.S. 408, 413 (1997); *see also Pennsylvania v. Mimms*, 434 U.S. 106, 110 (1977). Approaching a stopped car — particularly when there is reason to believe the driver or occupants may be armed — is one of the more perilous duties imposed on law enforcement officers. In 2002, according to a Department of Justice report, 58,066 police officers were assaulted in the line of duty. U.S. Dept. of Justice, Federal Bureau of Investigation, Uniform Crime Reports: Law Enforcement Officers Killed and Assaulted 73 (2002). Eleven percent of those assaults occurred during traffic stops or pursuits. *Id.* In the same year, 56 officers were killed in the line of duty (not counting accidental deaths), and 10 of those killings took place during traffic stops or pursuits — the second leading category, behind ambushes. *Id.* at 5. We cannot say that Officer Phillip took any unreasonable steps in attempting to ensure that he would not become one of these statistics.

**B.** Finding nothing unlawful about the seizure of the scale, we do not reach Holmes' argument that the seizure tainted the search incident to his arrest. We can similarly dispose of Holmes' related argument that he was effectively placed under arrest during the frisk rather than after the assault. As our holding above makes clear, Officer Phillip did not exceed the scope of a proper *Terry* frisk and, accordingly, there is no basis for finding that the pat-down constituted an arrest.

We are also unpersuaded by Holmes' final contention — that the search of his car exceeded the scope of a search incident to arrest. When the police make a lawful arrest, the Fourth Amendment permits them to search the arrestee and the area within his immediate control. *Chimel v. California*, 395 U.S. 752, 763 (1969). In *New York v. Belton*, 453 U.S. 454, 460 (1981), the Supreme Court held that such searches may extend to the passenger compartment of an automobile, so long as the person arrested was an occupant or recent occupant of the automobile. Just last Term, the Court clarified that *Belton*'s rule applies regardless of whether the police first initiate contact with the arrestee while he is still inside the vehicle. *Thornton v. United States*, 124 S. Ct. 2127, 2129 (2004).

Here, the district court found that Holmes was placed under arrest for assaulting Officer Phillip. Suppression Hr'g Tr. at 57. The court credited Phillip's testimony that Holmes had elbowed him without provocation and had proceeded to engage the officers in a fight. *See id.* at 56–57. Thus, the officers clearly had probable cause to arrest Holmes and to search both his person and the passenger compartment of his car.

Holmes first argued, in his initial brief, that the *Belton* rule did not apply to this case because the police arrested him outside his car. If that argument had any traction before *Thornton* it has none after it; the police in *Thornton* did not even accost the defendant until after he was outside the vehicle, *see* 124 S. Ct. at 2129, and the Court ruled that *Belton* still applied.

After we asked the parties to submit supplemental briefs in light of *Thornton*, Holmes understandably altered his position and argued for reversal based on the district court's failure expressly to find that the vehicle was subject to the defendant's control at the time the officers commenced the search. According to Holmes, in the absence of such a finding, the underlying justification for a *Belton* search evaporates. Supp. Br. at 3, 5.

This contention was rejected in *United States v. Wesley*, 293 F.3d 541, 549 (D.C. Cir. 2002) ("the police may search the passenger compartment of the vehicle without regard to whether the occupant was removed and secured at the time of the search"). Indeed, in *Thornton* itself, the defendant had been handcuffed and placed in the back seat of the patrol car prior to the search of his vehicle. *See* 124 S. Ct. at 2129. The search was upheld even though the defendant plainly had no control over the vehicle at the time.

### III.

"[W]hat the Constitution forbids is not all searches and seizures, but unreasonable searches and seizures." *Terry*, 392 U.S. at 9 (citation omitted). We agree with the district court that "it simply cannot be said that any of the actions of the police on the basis of what they saw was unreasonable." Suppression Hr'g Tr. at 56. The judgment of the district court is affirmed.