# United States Court of Appeals
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

Argued December 13, 2024       Decided August 26, 2025

No. 23-3044

UNITED STATES OF AMERICA,
APPELLEE

v.

RONNARD WILLIAMS,
APPELLANT

Appeal from the United States District Court
for the District of Columbia
(No. 1:20-cr-00088-2)

*Mary H. Schnoor* argued the cause for appellant. With her on the briefs were *A.J. Kramer*, Federal Public Defender, and *Rosanna Taormina*, Assistant Federal Public Defender. *Tony Axam Jr.*, Assistant Federal Public Defender, entered an appearance.

*Peter F. Andrews*, Assistant U.S. Attorney, argued the cause for appellee. With him on the brief were *Matthew M. Graves*, U.S. Attorney, and *Chrisellen R. Kolb* and *Nicholas P. Coleman*, Assistant U.S. Attorneys.

Before: WALKER, CHILDS and PAN, *Circuit Judges*.

Opinion for the Court filed by *Circuit Judge* WALKER.

Opinion concurring in the judgment filed by *Circuit Judge* CHILDS.

WALKER, *Circuit Judge*: Police officers approached an illegally parked car with illegally tinted windows. After the driver partially lowered his window to speak with them, the police ordered him to lower the windows more. Because he complied, the police were able to see a gun, which led to his arrest, prosecution, and conviction.

Appealing his conviction, the driver says that the order to lower his windows violated the Fourth Amendment. But *Pennsylvania v. Mimms* held that "once a motor vehicle has been lawfully detained for a traffic violation, the police officers may order the driver to get out of the vehicle without violating the Fourth Amendment's proscription of unreasonable searches and seizures." 434 U.S. 106, 111 n.6 (1977). That's because the "mere inconvenience" of exiting a car "cannot prevail when balanced against legitimate concerns for the officer's safety." *Id.* at 111.

For the same reason, at a lawful traffic stop, the police may order a driver to lower his windows when something like the window's tint makes it hard to see inside the car. The government's "legitimate concerns for the officer's safety" outweigh the "mere inconvenience" to the driver of lowering his windows. *Id.*

## I. Background

Around 11:00 p.m., Metropolitan Police Department officers approached a car that was illegally parked, with illegally tinted windows. After an officer tapped on his

window, the driver, Ronnard Williams, lowered his window — but only slightly. As the bodycam footage shows, the window tint made it hard for the police to see inside the car:



After some discussion with Williams, the police ordered him to roll his windows lower. Williams complied. That allowed the police to see a gun at the foot of a passenger in the backseat.

An officer opened the door and grabbed the gun. The police ordered Williams and the passenger out of the car and placed them under arrest. A search of the car revealed another gun, marijuana, and $2,000 in cash.

A federal grand jury indicted Williams for violating a federal statute that prohibits felons from possessing a firearm. *See* 18 U.S.C. § 922(g)(1). Williams then moved to suppress the evidence found in his car. He argued that the order to lower his windows was an unreasonable search in violation of the Fourth Amendment.

The district court denied the motion. A jury convicted Williams of unlawful possession of a firearm by a felon. The

court sentenced him to three years and five months in prison, with credit for time served.

Williams appealed, and we affirm.

## II. Analysis

Before us, Williams does not argue that the police lacked probable cause for a lawful traffic stop.[1] Nor does he dispute that the police could grab the gun in plain view after he obeyed their order to lower his tinted windows.[2] Rather, Williams says that their order, which put the gun in plain view, violated the Fourth Amendment.[3]

## A. The Fourth Amendment and *Mimms*

The Fourth Amendment guarantees the "right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV. Whether a search is lawful under the Fourth Amendment depends on "the reasonableness in all the circumstances of the particular governmental invasion of a citizen's personal security." *Terry v. Ohio*, 392 U.S. 1, 19 (1968). In determining reasonableness, we "balance . . . the

---

[1] *See Arizona v. Johnson*, 555 U.S. 323, 327 (2009) (a traffic stop is lawful when it is legally permissible "for police to detain an automobile and its occupants pending inquiry into a vehicular violation").

[2] *See Kentucky v. King*, 563 U.S. 452, 463 (2011) (under certain circumstances the police "may seize evidence in plain view" without a warrant).

[3] We review questions of law de novo and factual findings for clear error. *United States v. Hutchings*, 99 F.4th 604, 607 (D.C. Cir. 2024).

5

public interest and the individual's right to personal security free from arbitrary interference by law officers." *United States v. Brignoni-Ponce*, 422 U.S. 873, 878 (1975).[4]

Applying that standard, the Supreme Court held in *Pennsylvania v. Mimms* that "once a motor vehicle has been lawfully detained for a traffic violation, the police officers may order the driver to get out of the vehicle without violating the Fourth Amendment's proscription of unreasonable searches and seizures." 434 U.S. 106, 111 n.6 (1977). There, the government interest in officer safety was "both legitimate and weighty" because of "the inordinate risk confronting an officer as he approaches a person seated in an automobile." *Id.* at 110.[5] By contrast, "the order to get out of the car" was a "*de minimis*" intrusion into the driver's privacy. *Id.* at 111. Since *Mimms*, the Court has repeatedly reaffirmed its "bright-line rule" that "a police officer may as a matter of course order the driver of a lawfully stopped car to exit his vehicle." *United States v. Bullock*, 510 F.3d 342, 345 (D.C. Cir. 2007) (cleaned up).[6]

---

[4] *Cf.* Luke M. Milligan, *The Forgotten Right to Be Secure*, 65 HASTINGS L.J. 713, 717 (2014) (the Fourth Amendment protects "the right of the people *to be secure*," not just the "right to be 'spared' an unreasonable search or seizure" (cleaned up)).

[5] *Cf. Terry*, 392 U.S. at 23 ("Certainly it would be unreasonable to require that police officers take unnecessary risks in the performance of their duties.").

[6] *See, e.g.*, *Maryland v. Wilson*, 519 U.S. 408, 415 (1997) ("an officer making a traffic stop may order passengers to get out of the car pending completion of the stop"); *Michigan v. Long*, 463 U.S. 1032, 1047-48 (1983) (same); *Rakas v. Illinois*, 439 U.S. 128, 155 n.4 (1978) (Powell, J., concurring) (similar).

## B. Applying *Mimms*

This case is like *Mimms*. The Government's "legitimate and weighty" interest in officer safety easily outweighs the "mere inconvenience" of rolling down tinted windows. *Mimms*, 434 U.S. at 110-11.

Consider first the interest in officer safety. "Approaching a stopped car . . . is one of the more perilous duties imposed on law enforcement officers." *United States v. Holmes*, 385 F.3d 786, 791 (D.C. Cir. 2004) (Roberts, J.). Is the driver drunk? High? Armed? Are there any passengers? Has anyone in the car committed a violent crime? Do they intend to? What, if anything, are they hiding? And what will they do to keep it hidden? *See Barnes v. Felix*, 145 S. Ct. 1353, 1361 (2025) (Kavanaugh, J., concurring).

Because of these known unknowns — plus the unknown unknowns — traffic stops are "inherently risky for police officers." *Id.*; *cf.* DONALD RUMSFELD, KNOWN AND UNKNOWN: A MEMOIR xiii (2011). "People detained for minor offenses such as ordinary traffic violations can turn out to be the most devious and dangerous criminals." *Barnes*, 145 S. Ct. at 1361 (Kavanaugh, J., concurring) (cleaned up). That's one reason "that a significant percentage of murders of police officers occurs when the officers are making traffic stops." *Mimms*, 434 U.S. at 110 (cleaned up); *see also Long*, 463 U.S. at 1049 ("roadside encounters between police and suspects are especially hazardous"); Statistics on Law Enforcement Officer Deaths in the Line of Duty from January through August 2024, FBI, https://perma.cc/XS86-6DH2.

"When, during already dangerous traffic stops, officers must approach vehicles whose occupants and interiors are blocked from view by tinted windows, the potential harm to

which the officers are exposed increases exponentially, to the point, we believe, of unconscionability. Indeed, we can conceive of almost nothing more dangerous to a law enforcement officer in the context of a traffic stop than approaching an automobile whose passenger compartment is entirely hidden from the officer's view by darkly tinted windows." *United States v. Stanfield*, 109 F.3d 976, 981 (4th Cir. 1997) (emphasis omitted).

Consider next the driver's minimal interest in not lowering his window. If an order to exit the vehicle is a "*de minimis*" intrusion and "at most a mere inconvenience," then so too is an order to lower the windows. *Mimms*, 434 U.S. at 111. If anything, the intrusion here is even smaller. The driver exposes less by opening a window than by opening a door.[7] And the driver is inconvenienced less than by exiting the car — for the same reason it's easier for drive-thru workers to hand fast food through open windows rather than open doors.

Because a "mere inconvenience cannot prevail when balanced against legitimate concerns for the officer's safety," we hold that the police did not violate the Fourth Amendment when they ordered Williams to lower his windows. *Id.*[8]

---

[7] Though not necessary for our analysis, we note that opening a car door will often turn on the car's interior lights.

[8] *Cf. Stanfield*, 109 F.3d at 981 (during a lawful traffic stop, an officer may lawfully open a car door to view the interior when the windows are heavily tinted and may conceal threats); *United States v. Brown*, 334 F.3d 1161, 1168-69 (D.C. Cir. 2003) (similar, citing *Stanfield* approvingly); *United States v. Matthews*, 422 F. Supp. 3d 1235, 1251 (W.D. Ky. 2019) (an officer's "quick decision to open the car door" when "he could not see inside the vehicle because of the tint on the windows" was "prudent" and constitutional).

### III. Conclusion

When something like the tint of a car's windows makes it hard to see inside, the police can order the driver to lower the windows during a lawful traffic stop — including a stop justified by suspicion of the windows' illegal tint.[9]

We therefore affirm.

*So ordered.*

---

[9] To the extent other courts in similar situations have applied a standard more demanding or fact-specific than this bright-line rule, we disagree with them for the reasons already explained. *See, e.g.*, *United States v. Holley*, 709 F. App'x 602, 605 (11th Cir. 2017) ("the search stemmed from some probable cause focusing suspicion on the individual affected by the search"); *United States v. Jones*, No. 1:19-cr-20693, 2021 WL 2156195, *3-4 (E.D. Mich. May 27, 2021) ("unconstitutional search" where the officer opened the door of a car with tinted windows after the driver "had his windows rolled down" because there was "no reason to believe that opening the driver-side door was necessary for officer safety"); *United States v. Green*, 437 F. Supp. 2d 38, 41-42 (D.D.C. 2006) ("a tinted window violation . . . does not justify the search of a person or his or her vehicle without more"); *Jackson v. United States*, 56 A.3d 1206, 1213 (D.C. 2012) ("the facts of this case do not establish that the tinting was a meaningful factor justifying [the officer's] decision not only to open the door, but to cross the plane of the van and conduct a *Terry* search of the vehicle's interior" (cleaned up)).

CHILDS, *Circuit Judge*, concurring in the judgment: I concur insofar as the majority affirms the district court's denial of Ronnard Williams' motion to suppress. The record establishes specific, articulable facts showing that the traffic stop was lawful, that it was difficult for the officers to see inside Williams' vehicle, and that instructing him to roll down his windows to unblock their view was a minimal intrusion under the balancing test in *Pennsylvania v. Mimms*, 434 U.S. 106 (1977). Williams' unlawful window tint, combined with additional officer safety concerns, diminished his privacy interest and heightened officer safety interests.

I do not, however, agree with the majority's reasoning or its adoption of a categorical rule. The majority holds that whenever "something like the tint of a car's windows makes it hard to see inside, the police can order the driver to lower the windows during a lawful traffic stop — including a stop justified by suspicion of the windows' illegal tint." Majority Op. at 8. This broad rule is inconsistent with *Mimms* and its progeny, invites unnecessary intrusions, and is unmoored from the fact-specific balancing the Fourth Amendment requires. It may fit the facts of this case, but it offers no limiting principle and risks misuse in circumstances that do not justify the intrusion.

Under the majority's approach, even tint that proves lawful yet still obstructs visibility could justify a full, compelled exposure of the interior. If legally obstructed visibility alone sufficed, then any officer could transform a stop for a minor parking or traffic infraction into a warrantless inspection of a vehicle's interior, authorizing full exposure of deliberately concealed areas without an articulable safety threat. That reading collapses the line between precaution and pretext and erodes the very privacy interests the Fourth Amendment protects. Because I cannot endorse an approach that risks the quiet, gradual erosion of personal liberty under the banner of bright-line clarity, I concur in the judgment.

2

## I.

### A.

One late night, four officers from the District's Metropolitan Police Department's (MPD) specialized Gun Recovery Unit (GRU) were on duty in two unmarked cars. GRU officers are authorized to make "proactive" patrol stops, which are searches of persons and vehicles for firearms.[1] While the GRU's objective is to conduct firearm interdiction, there is an expectation that they address and enforce the rules and regulations of the District.

While patrolling, the GRU officers observed Williams' vehicle parked within five feet of a parking lot entrance, idling with its headlights on, and displaying what appeared to be illegally tinted windows. Two officers approached on foot from opposite sides. One initiated the stop, during which Williams partially lowered his driver's-side window to speak with the officer, who cited him for a tint violation. The second supervising officer walked from the driver's-side window around the rear of the car toward the front, where he observed a second passenger in the backseat through the windshield.

After a second patrol car arrived, the officers ordered Williams to roll all windows "all the way down." When Williams partially lowered them, the officers shined flashlights into the interior cabin without breaking the window plane. The supervising officer at the rear passenger side window observed

---

[1] D.C. Council Police Reform Comm'n, *Decentering Police to Improve Public Safety: A Report of the D.C. Police Reform Commission* 21 (Apr. 1, 2021), [https://perma.cc/M56W-TULG]. GRU practices have been criticized for "aggressive stop, pursuit, and search tactics that bump up against—and sometimes cross—constitutional boundaries." *Id.* at 94.

a male, awkwardly positioned and reclined in his seat. The officer at the driver's-side window gestured by snapping her fingers to the supervising officer, prompting him to direct his flashlight toward the rear passenger side floorboard, where he saw a firearm in plain view. Both occupants were arrested, and a subsequent search of the trunk yielded a second firearm.

**B.**

After evidentiary hearings in February, April, and May 2022, the district court denied Williams' motion to suppress. It credited the supervising officer's testimony as corroborated by body-worn camera footage. The court rejected Williams' reliance on MPD internal-affairs findings—resulting in the officer's suspension and administrative reprimand for unrelated Fourth Amendment violations during GRU patrols—as grounds to discount his credibility. The court found that officers reasonably determined Williams' car was parked within five feet of a parking lot entrance and that its window tint appeared illegal, later testing at 9% light transmittance—below the legal limit. It also credited the officer's explanations rebutting Williams' claims that oncoming headlights prevented him from seeing the tint, that his testimony was inconsistent across proceedings, and that tint enforcement fell outside the GRU's firearm-interdiction mission.

On the law, the court held that the stop was justified by both tint and parking violations. Ordering Williams to roll down his windows did not violate the Fourth Amendment under *Mimms*, 434 U.S. at 110, because, in the district court's view, the dark tint impeded visibility and officer safety is a weighty governmental interest. The court found the privacy intrusion to be "de minimis" and concluded that the firearm in the backseat was lawfully seized under the plain-view doctrine. The court further held that the officers had probable cause to

search the trunk after recovering the firearm, given the possibility of additional weapons or contraband, the backseat's access opening to the trunk area, recent reports of shootings nearby, and the presence of two occupants.

## C.

Williams was indicted under 18 U.S.C. § 922(g)(1) for possessing a firearm. After evidentiary hearings, the district court denied his motion to suppress. A jury convicted him in December 2022, and he was sentenced to 41 months imprisonment, three years of supervised release, and a $100 special assessment. Williams timely appealed.

## II.

The Fourth Amendment protects against "unreasonable searches and seizures." U.S. Const. amend. IV. The lawfulness of a search depends on the "reasonableness in all the circumstances" of the intrusion. *Terry v. Ohio*, 392 U.S. 1, 19 (1968). To assess reasonableness, courts must "balance . . . the public interest and the individual's right to personal security free from arbitrary interference by law officers." *United States v. Brignoni-Ponce*, 422 U.S. 873, 878 (1975).

My colleagues liken this case to *Mimms*, reasoning that ordering a driver out of a car is akin to directing a driver to roll down his windows, and that both are "at most a mere inconvenience." Majority Op. at 7. That analogy holds true in this case, where the window tint was so dark that even artificial light could not illuminate the driver's immediate reach. But it does not fit neatly when lawful tint limits visibility.

For vehicles with no window tint, lowering windows is a minimal intrusion because it adds little to what already lies in

plain view. Where tint is illegal, the privacy interest is diminished, and the safety interest is substantial.[2] Lawful tint, however, presents a different case. Rolling down those windows may expose areas deliberately and lawfully concealed from public view. That the exercise of rolling down a window may involve less physical effort than exiting a car does not make the two intrusions equivalent.[3] An exit order may reveal no more of the cabin than already visible, while lowering legally tinted windows may expose it entirely. Unlike *Mimms*, where the intrusion reduced risks of concealed movement and established face-to-face engagement, an order to roll down lawfully tinted windows is an intrusion that shifts the officer's attention from the person to the cabin's contents, revealing more than *Mimms* contemplated. 434 U.S. at 110.

In my view, the mere belief that visibility may be limited is not categorically sufficient to justify compelled cabin exposure. Officer safety is undoubtedly weighty, *Arizona v. Johnson*, 555 U.S. 323, 331–32 (2009), but *Mimms* should not be expanded to deem safety concerns automatically justified in

---

[2] A driver might claim greater privacy in areas lawfully concealed by legal tint, but Williams' use of illegal tint defeats that claim. "There is no legitimate expectation of privacy shielding that portion of the interior of an automobile which may be viewed from outside . . . by either inquisitive passersby or diligent police officers." *Texas v. Brown*, 460 U.S. 730, 739–40 (1983) (citation omitted).

[3] The majority analogizes a compelled lowering of the window to the ease of handing fast food through a drive-thru window, reasoning that it is less revealing than opening a door or exiting the vehicle. Majority Op. at 7. That trivializes the Fourth Amendment and diverts attention from the proper inquiry: whether, on the facts at hand, the instruction was reasonable. The Constitution does not measure the legitimacy of a search by its ease of execution. Voluntarily opening a window to accept food at a drive-thru differs in kind from being compelled to do so for a warrantless inspection.

every measure that might improve visibility. The Fourth Amendment requires that an instruction to improve safety be reasonable under the specific circumstances, not in the abstract. *See Brignoni-Ponce*, 422 U.S. at 878. *Mimms* permits such an intrusion only if it is supported by facts "available to the officer at the moment of the seizure or the search." 434 U.S. at 112 (quoting *Terry*, 392 U.S. at 21–22). As framed by the majority, the rule invites intrusion on the basis of mere hunches, enabling even a pretextual stop dressed up as a safety concern over window tint to force visual access to a vehicle's interior.[4] Even if one believes, as the majority suggested at oral argument, that "if the interest that we're trying to promote or protect here is officer safety, if they can't see, they can't see. It doesn't matter if this was a legal tint or illegal tint," Oral Arg. Tr. 34, the Constitution still demands that the intrusion be grounded in articulable facts, not an undifferentiated assertion of safety.

Imagine a motorist driving home from work in the early evening, windows rolled up against the cold. The vehicle's tint is lawful, and the driver commits no traffic violation. An officer on routine patrol, citing "visibility concerns," stops the

---

[4] The Fourth Amendment's reasonableness inquiry is objective: if the facts justify a stop, the officer's motive does not matter. *See Whren v. United States*, 517 U.S. 806, 813–14 (1996) ("Subjective intentions play no role in ordinary, probable-cause Fourth Amendment analysis."). Thus, the stop here, whether motivated by a genuine traffic concern or a pretext, was valid. But *Whren* does not authorize every further intrusion; each must be independently justified. "A determination that reasonable suspicion exists, however, need not rule out the possibility of innocent conduct." *United States v. Arvizu*, 534 U.S. 266, 277 (2002) (quoting *Illinois v. Wardlow*, 528 U.S. 119, 125 (2000)). The majority's approach collapses the distinction between a valid stop and an independent intrusion, allowing compelled exposure of a vehicle's interior without the individualized basis the Fourth Amendment demands.

car and orders the driver to lower all windows. There is no report of crime, no erratic driving, no furtive movement, and no other sign of danger. Under the majority's reasoning, the mere fact that tint limits a perfect view could justify this intrusion. That rule would allow officers to compel a vehicle's interior exposure without individualized suspicion, weakening the Fourth Amendment's protection against arbitrary interference. The harm lies in the government compelling access to private space without adequate justification. Rights ought not be measured by a person's willingness to forfeit them in harmless encounters, but by whether the government must meet the Constitution's requirement for specific and articulable grounds before it intrudes upon the individual.

Case law underscores the need for particularized facts. In *United States v. Brown*, we upheld an officer's opening of a car door not simply because window tint obstructed the view, but because the officers were responding to gunfire, saw a passenger switch seats, and observed suspicious behavior near the vehicle. 334 F.3d 1161, 1163–64 (D.C. Cir. 2003). In *United States v. Stanfield*, the Fourth Circuit upheld a similar intrusion based on multiple, specific indicators: a double-parked car in a high-crime area, a driver speaking with a known criminal, and heavily tinted windows. 109 F.3d 976, 978–79 (4th Cir. 1997). Neither court approved such an intrusion based on window tint alone. Moreover, the *Stanfield* court made clear that its holding addressed only traffic stops where dark tint magnified the threat to "the point of . . . unconscionability." *Id.* at 981. The majority's rule departs from that careful limitation, extending authority to situations far removed from the extraordinary facts that justified the result in *Stanfield*.

Here, the stop occurred late at night in a high-crime area with recent reports of violence. The car was illegally parked, and the tint was so dark that the driver remained obscured even

after partially lowering the window and with artificial light directed inside. A passenger was discovered only after a windshield survey. Those facts, taken together, bear closer resemblance to the elevated-risk conditions described in *Brown* and *Stanfield* than to a routine traffic encounter.

Absent such circumstances, obstructed visibility alone does not suffice. Many motorists lawfully use tint to preserve privacy. They do not forfeit that interest merely by passing through high-crime areas or by committing minor parking violations. Even if an officer can't see clearly into a vehicle, the driver still has a constitutional privacy interest when the tint is legal, because that level of concealment is authorized by law.[5] Those circumstances may heighten an officer's alertness, but each alone does not transform a motorist into a threat. That distinction matters both to avoid legitimizing suspicion by association and to prevent intrusions on liberty without sufficient basis. Otherwise, we risk eroding the line between legitimate precaution and impermissible pretext, at the expense of the privacy the Fourth Amendment was intended to protect.

### III.

For the foregoing reasons, I concur in the judgment.

---

[5] Factory-installed tint may appear opaque in bright sunlight. At night, lawful tint can make a driver difficult to see when cabin lights are off or street lighting is poor. Rain or condensation can further reduce transparency, as can the angle of approach or the darker tint permitted on rear passenger windows in many jurisdictions. None of these conditions, alone, poses a genuine safety risk.